224 N.J. Super. 534 (1988)
540 A.2d 1334
NEW JERSEY STATE PAROLE BOARD, PLAINTIFF-RESPONDENT,
v.
CARL CESTARI, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued March 29, 1988.
Decided April 20, 1988.
*537 Before Judges PRESSLER, MUIR, Jr. and SKILLMAN.
Eric J. Marcy argued the cause for appellant (Wilentz, Goldman & Spitzer, attorneys; Eric J. Marcy, of counsel; Jeffrey L. Menkin and Eric J. Marcy on the brief).
*538 Stuart J. Lieberman, Deputy Attorney General, argued the cause for respondent (W. Cary Edwards, Attorney General, attorney; Michael R. Clancy, Deputy Attorney General, of counsel; Stuart J. Lieberman, on the brief).
The opinion of the court was delivered by SKILLMAN, J.A.D.
In 1982, appellant Carl Cestari, a 23 year old member of the Roselle police department, resigned to join the Army. At a farewell party given for him by his fellow officers, a bizarre incident occurred in which Cestari shot another police officer. As a result, Cestari was convicted of reckless manslaughter, in violation of N.J.S.A. 2C:11-4(b)(1), and sentenced to a custodial term of nine years, with a three year parole ineligibility term mandated by the Graves Act, N.J.S.A. 2C:43-6(c). Upon the expiration of the parole ineligibility term, Cestari became eligible for parole. Under N.J.S.A. 30:4-123.53, the Parole Board was required to grant him parole unless it found "by a preponderance of the evidence that there is a substantial likelihood that the inmate will commit a crime under the laws of this State if released." Despite the fact that Cestari had led a completely law abiding life except for the single incident resulting in his conviction and that three out of the four mental health professionals who evaluated him issued favorable reports, the Adult Panel of the Parole Board found there was a substantial likelihood he would commit another crime if released, and thus denied parole. We conclude that this finding was arbitrary and capricious, and therefore we reverse.
Cestari was convicted on November 4, 1982 and sentenced on December 6, 1982. However, he remained free on bail prior to trial and pending appeal. Consequently, he did not begin serving his sentence until May 21, 1984, after this court had affirmed his conviction in an unreported opinion, State v. Cestari, A-1450-82T4, and the Supreme Court had denied certification, *539 97 N.J. 600 (1984). Thus, his initial parole eligibility date was May 21, 1987.
Dr. Larry Seifer, a psychological consultant, submitted a report to the Parole Board on September 25, 1986, which stated that Cestari's "... mood, affect, insight, judgment and orientation were all appropriate." He also found that Cestari was not "clinically ill" and was not a "custodial risk." Dr. Seifer concluded that Cestari's "... offense was situational with little chance of reoccurrence" and therefore that his chances for success on parole were "good."
The preparole reports submitted to the Parole Board by the Department of Corrections were highly favorable to Cestari in all respects. These reports stated that he had not committed any institutional disciplinary infractions, that he had done exceptionally well in his work assignments, and that he got along well with staff and fellow inmates.
On November 7, 1986, Cestari was interviewed at an initial parole hearing by hearing officer John West of the Parole Board. Based upon the preparole reports and the interview, the hearing officer recommended that Cestari be paroled at the earliest possible date. He commented as follows:
... [Y]ou're recommended for parole, this case can be summed up in one word, "tragic." [F]or all involved  victim, victim's family, subject, and his family  there is and always will be sorrow and remorse. Subject stands convicted of killing accidentally his best friend. Subject had everything going for him and so did the victim. In one short instant, victim's life was ended and subject's world was shattered. Even a third police officer who was a witness to the incident has suffered terribly and has emotional problems today. Further incarceration beyond the punitive minimum will be totally pointless. Subject has paid his debt and has suffered greatly. Subject has served time and has been successful in making a bad situation into a positive one.
There is no prior record, no exposure to community service and supervision. Good parole plans, good institutional adjustment, good previous employment, good attitude. I believe subject will succeed. If he does not, I don't think anyone would ever feel safe in paroling another inmate. He represents no danger in any way.
In preparation for his release on parole, Cestari was transferred in January 1987 to "Pyramid House," a halfway house in *540 Essex County. While in this facility, he was employed through a work release program in a delicatessen where he worked as a clerk, deliveryman and cook.
Cestari was also sent to Catholic Community Services, Division of Mental Health, Mount Carmel Guild, located in Newark, for evaluations by a psychiatrist and a psychologist, both of whom issued favorable reports. Based on the evaluations contained in these reports, the Division of Mental Health of Catholic Community Services reported to Pyramid House on April 22, 1987 that Cestari had "... adjusted well and Mental Health Services will not be need at this time."
Around the same time as Cestari was being evaluated at Catholic Community Services, the Parole Board also had him evaluated by another psychologist, Frederic Rotgers, who reported in part as follows:
Mr. Cestari's MMPI profile was completely within normal limits, although elevated to almost clinical significance, with the exception of his score on the K scale, an indicator of openness and willingness to acknowledge weakness. Persons who score very high on this scale find it quite difficult to acknowledge any weakness or personal problems, rather tending to attempt to maintain an appearance of adequacy, control and effectiveness. These individuals tend to be quite impaired in their ability to become emotionally close to and empathize with others as they are terrified of revealing weakness. In addition, Mr. Cestari's performance on the Subtle-Obvious items, items which either are quite clearly on their face indicative of pathology as opposed to having little apparent, but a strong actual relationship to pathology, suggests that he purposely and consciously avoided answering these items in a pathological direction. Thus, while the average normal will answer 31 of 146 of these items in the pathological direction, Mr. Cestari answered only 7 of them in the pathological direction. This suggests conscious avoidance of admitting pathology.
Clinically, given Mr. Cestari's obvious attempt to deny problems on the MMPI his profile is a significant one. Although just below the level for clinical significance, the pattern of elevations of scales is consistent with a person who is quite hostile and angry, but maintains a facade of normalcy that is quite prone to deterioration under stress leaving the individual prone to inexplicable aggression. These individuals tend to be quite out of touch with their feelings until they become too strong to deny or until their controls are weakened by alcohol. Although they appear quite socially appropriate outwardly, they are inwardly quite rebellious, sensitive to rejection, and prone to outbursts of hostility when criticized. They are quite self-centered, narcissistic and grandiose. *541 They often deny psychological problems of any sort and express a very naive, pollyannaish, black and white attitude toward the world.
Overall, the results of this evaluation suggest that Mr. Cestari has significant problems intrapsychically that he has become adept at covering up to a great degree. Unfortunately, the full story of what happened immediately prior to and during the incident in which Mr. Cestari killed his "best friend" may never be clearly known. However, one might hypothesize that Mr. Cestari had felt rejected in some way by the victim, and being out of touch with his feelings, had proposed unconsciously, a "play" in which he could express his angry feelings without directly taking responsibility for the outcome. He still does not do so, nor is he likely to without extensive, probing, insight oriented psychotherapy on at least a twice weekly basis for many years. Unfortunately without evidence of some progress toward coming to grips with the personality factors that led to the offense, Mr. Cestari must still be considered to have the potential to become involved in a violent incident in the future. Perhaps he recognizes this at some level and used the police, marshall [sic] arts training, and prospectively, the rangers as a means of trying to provide himself with appropriate controls and settings for expression of his anger. Unfortunately, this anger still appears to lie beneath the surface, and Mr. Cestari has done nothing to address it.[1]
The Adult Panel of the Parole Board conducted a hearing with respect to Cestari's release on parole on August 25, 1987. Only Cestari testified at the hearing. The members of the Panel questioned Cestari primarily on the circumstances of the offense. He related that the shooting occurred at a farewell party given for him upon his resignation from the police department to enter the Army. The party was attended primarily by police officers, many of whom had their handguns with them. Many of the officers also consumed considerable amounts of alcoholic beverages. Sometime during the evening, the victim John Maiorella, who had been Cestari's partner on the police force, suggested to Cestari that they have photographs taken of them. Cestari, Maiorella, the photographer, and several other officers went to the basement of the house where the party was held. The group decided at some point to use their handguns as props in the pictures. Live cartridges were left in the handgun, but according to Cestari, they were "... in a *542 position that all of us that were there were sure that there would be no way the weapon could discharge." The officers pointed their weapons at each other in several pictures. At some point, the victim said that he wanted to make the pictures more realistic and that Cestari should "pull the trigger." Cestari thumbed the hammer of the revolver back, but he did not pull the trigger. As he attempted to release the hammer and put the weapon down, it discharged and Maiorella was killed.
At the conclusion of the hearing, the Adult Panel advised Cestari that it was denying him parole and that he would not be reconsidered for parole for eighteen months. This denial was formalized in a written decision dated September 15, 1987.
Cestari sought reconsideration of the Adult Panel's decision pursuant to N.J.A.C. 10A:71-4.1 and also appealed to the full Parole Board pursuant to N.J.A.C. 10A:71-4.2. The Adult Panel denied Cestari's request for reconsideration and the Parole Board found that his appeal was "without merit."[2] This appeal followed.

I
Before addressing the merits of this appeal, it is necessary to comment upon a number of procedural deficiencies in the Parole Board's consideration of Cestari's parole.
*543 First, the Adult Panel failed to conduct a parole hearing by the date required under N.J.S.A. 30:4-123.55c. This section provides in pertinent part as follows:
If the hearing officer or the assigned member determines that there is a basis for denial of parole, or that a hearing is otherwise necessary, the hearing officer or assigned member shall notify the appropriate board panel and the inmate in writing of his determination, and of a date for a parole consideration hearing. Said hearing shall be conducted by the appropriate board panel at least 30 days prior to the eligibility date. [Emphasis added].
Since Cestari's initial parole eligibility date was May 21, 1987, the Adult Panel was required to conduct a parole hearing no later than April 21, 1987.[3] However, the hearing was not held until August 25, 1987, more than four months after the statutory deadline.
The record contains no explanation for the Panel's failure to conduct a timely parole hearing.[4] All of the psychological evaluations and other preparole reports were completed by March 31, 1987. Thus, there was ample time to consider *544 Cestari's release on parole by the deadline set by the Legislature.
Although we recognize the tremendous caseload of the Parole Board, it is imperative that it comply with the thirty day deadline established by N.J.S.A. 30:4-123.55c. Violations of this legislative directive infringe on the rights of inmates who are entitled to be released on parole and also aggravate the problems of overcrowding in our prison system.
It appears from the record that the Adult Panel committed further procedural error by not considering all available psychiatric and psychological reports regarding Cestari. N.J.S.A. 30:4-123.55c obligates a Board panel at a parole hearing to "... receive as evidence any relevant and reliable documents." Cestari advised the Panel that he had attended four sessions at the Mount Carmel Guild in Newark, where he had been evaluated by the heads of the psychiatry and psychology departments, and that he understood those evaluations were favorable. The Panel's response to Cestari was that they had no reports from the mental health professionals at the Mount Carmel Guild. However, the record does not indicate that the Panel made any effort to obtain those reports or that it considered Cestari's representation that those reports had been favorable.
We conclude that the Adult Panel should have obtained the written reports prepared at the Mount Carmel Guild. Cestari was referred to the Mount Carmel Guild while an inmate in the New Jersey correctional system. Therefore, the reports prepared at that facility were undoubtedly available to correction officials and should have been placed in his parole file. Furthermore, when the members of the Panel were advised that those reports were not in the parole file, they should have obtained them. It is evident from the Panel's decision that they were heavily influenced by Dr. Rotgers' adverse psychological evaluation of Cestari. In our view, a full review of the favorable evaluations of Cestari by other mental health professionals *545 was required in order for the Panel to make a balanced and fair evaluation of Cestari's entitlement to release on parole.[5]
The Adult Panel also committed procedural error by receiving information about Cestari's case which was not made part of the record. N.J.S.A. 30:4-123.55c provides in pertinent part:
... The decision of the board panel shall be based solely on the evidence presented at the hearing.
This provision codifies the basic principle of administrative law of the exclusiveness of the record. This principle was enunciated by the Court in Mazza v. Cavicchia, 15 N.J. 498, 514 (1954), quoting Benjamin, Administrative Adjudication in New York, 207 (1942), as follows: "Where a hearing is prescribed by statute, nothing must be taken into account by the administrative tribunal in arriving at its determination that has not been introduced in some manner into the record of the hearing." See also Beckworth v. N.J. State Parole Bd., 62 N.J. 348, 362-363 (1973).
The transcript of the hearing before the Adult Panel indicates that it received information from sources not made a part of the record. For example, one member of the Panel asked Cestari:
Are you aware that sometime before the killing that the victim had phoned home that he was not going to be there much longer, that there were things going on that he didn't like?
Cestari denied knowledge of such a telephone call, and there is nothing in the record to indicate the source of the Panel's *546 purported information concerning the existence of such a call. At another point in the hearing, the same member of the panel said to Cestari:
You told Bob Casper that you didn't want the rest of them down there because this was just between you and him, meaning the victim. Why did you tell him that?
Cestari responded that he did not recall making such a statement, and again we find no source for this statement in the record. Finally, before announcing the Panel's decision at the conclusion of the hearing, one member said:
We took more time than we ordinarily would because we wanted to make some phone calls and get information we didn't have. We now have that information.
The Panel member did not identify the persons he had spoken with over the telephone or what information those persons had provided.
At oral argument, the Deputy Attorney General representing the Parole Board acknowledged that the Board must confine itself to information contained in the record when making a parole release determination. He also asserted that the Adult Panel's decision in this case had been based solely on the record before us. Nevertheless, the frequent references during the parole hearing to information not contained in the record suggest that the Panel's decision making process may have been tainted by extraneous influences. As required by N.J.S.A. 30:4-123.55c, our review of the agency's action is based solely on the evidence in the record.

II
N.J.S.A. 30:4-123.53a provides in pertinent part:
a. An adult inmate shall be released on parole at the time of parole eligibility, unless information supplied in the report filed pursuant to section 10 of this act or developed or produced at a hearing held pursuant to section 11 of this act indicates by a preponderance of the evidence that there is a substantial likelihood that the inmate will commit a crime under the laws of this State if released on parole at such time.
*547 "The [Parole] Act thus posits the likelihood of future criminal conduct as the determinative test for parole eligibility and effectively established a presumption in favor of parole." In re Trantino Parole Application, 89 N.J. 347, 355-356 (1982). Under this test the discretionary authority of the Parole Board is more circumscribed than under the Parole Act in effect prior to 1979. Id. at 368-369. The 1979 Parole Act "... in effect, eliminated the conventional parole discretion relating to adequacy of punishment, and transferred it substantially to the judiciary as a function of its sentencing authority under the Code." N.J. Parole Bd. v. Byrne, 93 N.J. 192, 205 (1983). Moreover, the Act places the burden on the State "... to prove that the prisoner is a recidivist and should not be released." Ibid.
A denial of parole is subject to judicial review for arbitrariness. In re Hawley, 98 N.J. 108, 112-113 (1984). The question whether there is a substantial likelihood an inmate will commit another crime if released, although predictive of future conduct rather than a finding as to past conduct, is essentially factual in nature. Therefore, a reviewing court must determine whether this factual finding could reasonably have been reached on sufficient credible evidence in the whole record. Mayflower Securities v. Bureau of Securities, 64 N.J. 85, 92-93 (1973). Under this standard, the agency's decision will be set aside "if there exists in the reviewing mind a definite conviction that the determination below went so far wide of the mark that a mistake must have been made." 613 Corp. v. State of N.J., Div. of State Lottery, 210 N.J. Super. 485, 495 (App.Div. 1986). "This sense of `wrongness' arises in several ways, among which are the lack of inherently credible supporting evidence, the obvious overlooking or underevaluation of crucial evidence or a clearly unjust result." Ibid. Thus, if the record does not contain sufficient evidence that there is a substantial likelihood an inmate will commit another offense if released, the denial of parole must be found to have been *548 arbitrary and capricious.[6]
In concluding that there was a substantial likelihood Cestari would commit another crime if released on parole, the Adult Panel stated:
Upon review of your case the Panel is concerned by the serious nature of this offense. Your actions caused the death of the victim. The Adult Panel is concerned by the contents of the professional report that raised a question as to the suitability of parole release at this time. The Panel is also concerned that you have not maximized your participation in supportive counseling programs. The Panel strongly urges you to get into one on one therapy with a professional. Your good adjustment in the institution as well as your status on work release has been noted.
Upon consideration of all the above factors the Panel is of the opinion that a substantial likelihood exists that you would commit a new crime if released on parole at this time. For these reasons parole has been denied.
The foregoing reasons are an inadequate basis for denying parole. The first reason given by the Adult Panel for denying Cestari's parole was the "serious nature of the offense." However, under the Parole Act of 1979 "the gravity of the crime may not now be considered an independent reason for continuing punishment and denying parole." In re Trantino Parole Application, supra, 89 N.J. at 373. The seriousness of *549 the crime may be considered only "as an element in determining whether the offender's punishment has been adequate to insure his individual progress toward rehabilitation." Id. at 373-374. The Panel indicated that its concern regarding the "serious nature of the offense" related solely to the fact that Cestari's "actions caused the death of the victim" and not to any individual circumstances of the crime he committed. However, the death of the victim is inherent in the crime of reckless manslaughter and therefore not an appropriate basis for denying parole. Cf. State v. Link, 197 N.J. Super. 615, 619-620 (App. Div. 1984). Rather, only the particular circumstances of the crime committed by Cestari are pertinent to his fitness for parole release. Thus, in In re Trantino Parole Application, supra, 89 N.J. at 374, the Court described the murder committed by Trantino as "particularly heinous" in upholding the denial of his parole. In contrast, Cestari's crime consisted of a single act of recklessness in an otherwise law abiding life. Nothing in the circumstances of that isolated act indicates a "substantial likelihood" that Cestari will commit another crime.
The Adult Panel's expressed concern that Cestari had not "maximized [his] participation in supportive counselling programs" also does not provide any support for denying him parole. The record fails to indicate that any counselling program was offered to Cestari in which he refused to participate. To the contrary, the Mount Carmel Guild, where Cestari was referred for evaluation shortly before his initial parole eligibility date, concluded that he had adjusted well and that mental health services were not required.
The final grounds for the Adult Panel's denial of Cestari's parole was "... the contents of the professional report that raised a question as to the suitability of parole release at this time." This was obviously a reference to Dr. Rotgers' report, which has been quoted at length earlier in this opinion. The *550 question before us is whether that report provided a sufficient basis for denial of Cestari's parole.
Although Dr. Rotgers' report was unfavorable to Cestari, it did not say that there was a "substantial likelihood" he would commit another crime if released. Dr. Rotgers only concluded that "Mr. Cestari must still be considered to have the potential to become involved in a violent incident in the future." Rotgers' opinion that Cestari has "the potential to become involved in a violent incident" does not mean that there is a "substantial likelihood" he will commit another crime. Indeed, it could be accurately said that nearly all violent offenders, and many persons who have never been convicted of violent offenses, have the "potential" to become involved in a violent incident. It is only when that "potential" rises to the level of a "substantial likelihood" that another crime will be committed that parole may be denied. Thus, the Adult Panel read more into Dr. Rotgers' solitary negative evaluation of Cestari than actually is stated in his report.
Moreover, there was substantial other evidence of the likelihood of Cestari succeeding on parole. The preparole reports submitted by the Department of Corrections indicated that he had been a model prisoner despite having to cope with the obviously difficult circumstance of being a former policeman incarcerated in a penal institution. In addition, a psychiatrist and two psychologists provided favorable evaluations of Cestari. The psychiatrist at the Mount Carmel Guild concluded that he had "adjusted well to his release" and that "Mental Health follow-up is not indicated." The psychologist at that facility concluded that "there are no indications of a formal thought or affective disorder" and that Cestari was "strongly motivated toward reconstructing his life." Another psychologist, Dr. Larry Seifer, issued a report on September 25, 1986 that Cestari's prognosis for success on parole was "good" because his "offense was situational with little chance of reoccurrence." *551 Dr. Seifer issued a second report to the Parole Board on October 14, 1987, apparently after a second interview of Cestari, in which he reaffirmed his earlier favorable opinion of Cestari's suitability for parole. According to this report, Seifer's interview of Cestari "focused on readiness for parole and community release and revealed no psychological contraindications."
The Adult Panel's decision failed to mention any of the favorable evaluations of Cestari made by the correctional officials who had observed him on a regular basis during his three years of incarceration or the opinions of the psychiatrist and psychologists who had concluded that Cestari's prognosis for success on parole was good. Indeed, the only indication that the Adult Panel was aware of any of the evidence favorable to Cestari's release on parole is the following comment by one Panel member at the conclusion of the parole hearing:
I know that you don't feel that you need therapy. There are people who have talked with you who are not convinced that you do, there are some who have talked with you who are absolutely convinced that you do need it before you are released or we're all going to be in trouble. I don't know who's right. My gut tells me that you got some stuff down underneath the surface that you haven't even talked about that you need to deal with one-on-one with a therapist before you leave prison in order to reduce the chances that you get in trouble again.
In our view, the "gut" reaction of members of the Parole Board is not an appropriate substitute for consideration of all the evidence pertinent to whether a prospective parolee is likely to commit another crime. See In re Trantino Parole Application, supra, 89 N.J. at 368. Our review of all the relevant evidence convinces us that the Adult Panel's determination that there is a substantial likelihood Cestari will commit another crime if released on parole is not supported by the whole record, and that the denial of his parole was therefore arbitrary and capricious.
Accordingly, we reverse the decision denying Cestari parole and direct that he be released on parole forthwith.
NOTES
[1] Upon a full review of the case, we have determined that there is no current reason for this report to remain confidential. See Thompson v. New Jersey State Parole Bd., 210 N.J. Super. 107, 116-127 (App.Div. 1986).
[2] An inmate appealing a Board panel's decision to the entire Board must satisfy one of the following conditions:

1. The Board panel failed to consider material facts or failed to document that a preponderance of the evidence indicates a substantial likelihood that the inmate will commit a crime if released on parole.
2. The Board panel's decision is contrary to written Board policy or procedure.
3. A Board member participating in the deliberations or disposition of the case has a demonstrable personal interest in the case which affected the decision. [N.J.A.C. 10A:71-4.2(a)].
The Parole Board concluded that Cestari had failed to establish any of these three conditions. However, it did not conduct a plenary review of the denial of his parole. Therefore, the decision of the Adult Panel is the final decision of the agency.
[3] Where a hearing officer recommends that an inmate be released on parole, the assigned member or members of the Board panel may certify parole release without scheduling a hearing before the panel. N.J.S.A. 30:4-123.55b; N.J.A.C. 10A:71-3.16. We note that in fiscal years 1984 to 1986 Adult Panel members granted parole without a hearing in approximately 90% of the cases in which there was an affirmative recommendation by a hearing officer. Annual Report, New Jersey State Parole Board, (July 1, 1985 to June 30, 1986), at 42. We also note that N.J.A.C. 10A:71-3.16(d) provides that:

If such Board member(s) does not concur with the recommendation of the hearing officer, the member(s) shall refer the case to the appropriate Board panel for a hearing and issue a written decision to the inmate, the Department and the Board within seven days consisting of the reasons for the Board member's referral.
The record before us does not indicate that any written decision was issued upon the referral of Cestari's case to the Adult Panel for a hearing.
[4] At oral argument, the Deputy Attorney General representing the Parole Board stated that it had fallen behind in scheduling hearings due to a lack of manpower at the time Cestari became eligible for parole, but that the increase in the size of the Board resulting from enactment of Chapter 396 of the Laws of 1987 has enabled it to become more current.
[5] We note that when Cestari appealed the denial of his parole to the full Parole Board, he submitted the evaluations conducted at the Mount Carmel Guild to the Board, which referred them to the Adult Panel. The Board's decision contains the following comment with respect to the Panel's considerations of these reports:

... the Board Panel determined that this information would not alter its prior decision to deny parole and to affirm that decision. The Board Panel reiterated its concern by the serious nature of the offense and circumstances surrounding it supported by the contents of the professional report that raised a question as to the suitability of parole release at this time.
[6] The Parole Board contends that a decision to deny parole may not be set aside unless it is shown by "clear and convincing" evidence that the Board abused its discretion, citing In re Hawley, 192 N.J. Super. 85, 94 (App.Div. 1983). We reject the contention that a more restrictive standard of judicial review should apply to parole release than to other administrative agency decisions. Decisions of administrative agencies are generally subject to a uniform standard of review; such a decision will be upheld unless "it is arbitrary, capricious or unreasonable or it is not supported by substantial credible evidence in the record as a whole." Henry v. Rahway State Prison, 81 N.J. 571, 579-580 (1980). Consistent with this generally accepted standard, the Supreme Court said in Hawley that: "We find no reason to exempt the Parole Board from the well-established principle that a court may review the actions of an administrative agency to determine if its power is being exercised arbitrarily or capriciously." 98 N.J. at 112. We add that application of a more restrictive standard of review to decisions of the Parole Board would be inconsistent with the Parole Act of 1979's objective to reduce the discretionary authority of the Board. See In re Trantino Parole Application, supra, 89 N.J. at 355-356. In any event, we would reach the same result in this case even under the more restrictive standard of review urged by the Parole Board.