830 A.2d 914

MARGARET KOSMIN, APPELLANT, v. NEW JERSEY
STATE PAROLE BOARD, RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued June 3, 2003—Decided June 18, 2003.

Before Judges PRESSLER, CIANCIA and AXELRAD.

*Robert B. Reed*, argued the cause for appellant (*Reed and Scholl*, attorneys; *Mr. Reed*, of counsel and on the brief; *Mark F. Donlon* and *Melissa A. D'Arcy*, on the brief).

*Nicole Schreiner*, Deputy Attorney General, argued the cause for respondent (*Peter C. Harvey*, Acting Attorney General, attorney; *Ms. Schreiner* and *Patrick DeAlmeida*, Deputy Attorney General, on the brief).

The opinion of the court was delivered by

PRESSLER, P.J.A.D.

Appellant Margaret Kosmin appeals from the denial by respondent Parole Board of her application for parole. We have concluded from our review of this record that it cannot support the Parole Board's stated reason for denial of parole, namely, that if released she will be likely to commit another crime. Accordingly, we conclude that the denial of parole was arbitrary and unreasonable, and we reverse.

Kosmin pleaded guilty in 1994 to aggravated manslaughter, *N.J.S.A.* 2C:11–4a, as a lesser included offense of the first-degree murder with which she was charged; hindering apprehension or prosecution by the concealment of a weapon, *N.J.S.A.* 2C:29–3a(3), 2C:29–3b(1); and aggravated arson, *N.J.S.A.* 2C:17–1a(2). She was sentenced on December 16, 1994, to a twenty-year term subject to eight years of parole ineligibility for the manslaughter, a concurrent sentence of five years on the hindering, and a consecutive sentence of five years on the arson, for an aggregate sentence of twenty-five years subject to an eight-year parole ineligibility term. Her parole eligibility date was December 27, 2001.

The gravamen of appellant's crimes, in which she was aided by her accomplice, her friend Tammy Molewicz, was the shooting murder of William Kelly and their attempt to cover up the crime by burning the car in which they had transported his body to the woods. Appellant's motive for the murder was undisputed. After

many years of severe physical, psychological and sexual abuse by Kelly, with whom she lived during two different periods of her life and who had fathered her daughter, she had apparently concluded that only his death would free her and her daughter from him and from the terror to which he had reduced her life.

The fact of the abuse and its severity were acknowledged by the trial judge at sentencing. A psychiatric report prepared for appellant's lawyers shortly before sentencing, whose factual recitals have never been challenged by the State, sets forth in excruciating detail the relationship between appellant and Kelly, which was the outgrowth of her own childhood traumas resulting from her father's drunken abuse of her mother and her mother's escape, leaving appellant and her younger sister with their father where they endured physical and emotional privations until they were eventually reunited with their mother after her remarriage.

By way of brief summary, appellant met Kelly at school when she was in the ninth grade. Kelly lived with his father, also an alcoholic wife-beater, following his mother's escape from the marital home and his parents' ensuing divorce. Appellant and Kelly began dating in 1975 when she was fourteen years old. Kelly was then already abusing drugs and alcohol. The cycle of Kelly's physical and sexual abuse of appellant began some months later and escalated to the point at which he brutally assaulted her at least weekly. He also forced her to drop out of school, beating her if she attempted to attend. Although she did attempt to return to school, she was again forced to leave because of her pregnancy and her daughter's birth, after which she moved in with Kelly and his father. Kelly's abuse of her only intensified, putting her in fear for her life and causing her to sleep with a knife under her pillow. At one point she attempted suicide by taking an overdose of pills, believing that if she tried to leave him he would make good his threats to kill her. Apparently in 1978 or 1979, appellant managed to extricate herself from Kelly and to successfully conceal herself and the child from him with her mother's assistance despite Kelly's continuous harassment of and threats to

her family and friends in his efforts to locate her. Indeed, although she initially had no employment, she did not apply for welfare assistance for fear that Kelly might find her through the welfare system.

During the next fourteen years, appellant managed to put her life together, found satisfactory employment, and married a man who adopted her daughter. She lived for a brief time in Florida with her husband with whom she unsuccessfully attempted a reconciliation after the marriage had failed by reason of his infidelity. She returned with her daughter to New Jersey some time around 1990 and attempted to resume a normal life. In 1992, however, appellant learned that Kelly was attempting to locate her through her uncle by threatening his life. Eventually appellant communicated with Kelly's brother and sister, was told by them that he was ill and needed drug rehabilitation, and was asked to give him assistance. After meeting with him, she yielded to his entreaties that they reunite believing that he was no longer dangerous and had changed over the years. She was mistaken. After only a week or two, his violence, both physical mental, resumed, escalating in frequency and intensity and ultimately requiring her to obtain police assistance in physically removing him from her home after he broke down her locked bedroom door, a task accomplished only with the help of the canine unit. She obtained a restraining order, he was arrested for violating it and incarcerated, and after his release expressed remorse and begged appellant to take him back. She did so, only to be victimized again even more brutally than before, including an incident in which he beat her at a train station with a metal club. He began to leave threatening messages on her answering machine and she believed he really intended to kill her. She arranged a ruse with the police in order to get Kelly back to New Jersey, where he was again arrested and incarcerated. In the meantime appellant's own mental state began to deteriorate, she spent Christmas Day 1993 drinking and again attempted suicide by an overdose of pills. She was in mortal terror of Kelly's release from jail.

On the evening of December 26, 1993, Kelly called appellant from jail demanding that she post bail for him. She was by this time completely distraught and under the influence of alcohol and tranquilizers. Her friend Molewicz and she then decided to go to the jail to post bail, and appellant brought a gun with her, assertedly for her self-protection. They retrieved Kelly from jail, shot him, took his body to the woods and tried to burn Molewicz's car. Although in a subsequent statement to the authorities, appellant once said that she was the shooter, she continually denied that role both before and after, and, indeed, the sentencing judge noted that there was nothing in the record to indicate which of the women was the shooter. That fact has never been determined.

Both Molewicz and appellant were thereafter charged with the murder and the related crimes. Molewicz also pleaded guilty, and we were advised at oral argument that she had by then already been released on parole.

According to the record before us, appellant has been a model prisoner since her incarceration. Not only had she been infraction-free for seven years, but she also availed herself of a wide variety of programs, including NA/AA. As the panel eventually noted, "Your parole records abound with certificates for participating in programs too numerous to mention in this notice.[1] The

---

[1] These programs included Al–Anon, AA/NA, Drug Awareness seminar, Paralegal courses, The American Program, The Addict Program, Para–Professional Inmate Legal Association, Spanish Class, Tutor Training Workshops including eventually serving as the facilitator for such workshops, Behavior Motivation for Success, Creative Book Discussion, Women Becoming Aware (battered women's support group), Prisoner's Representative Committee elected volunteer, Hyacinth/AIDS Foundation seminars for AIDS awareness, Keys to Inversion Behavior Modification Course, House of Healing emotional awareness and healing course, Homemaking courses, Horticulture courses, Advanced Horticulture courses, 3 Kings Latino Holiday Show, Black History Show, Literacy Volunteers of America, and Pace Electronics courses in assembly and repair.

Her voluntary positions included serving as secretary, tutor and tutor training facilitator for the Literacy Volunteers of America; para-professional audio/video aide, performance of a self-written, one-woman play "The Colorful

Board panel has reviewed a bound set of documents entitled 'Institutional Program Certificates of Achievement and Recognition.' The Board Panel has also reviewed your Special Activities Reports and your Progress Report both outlining your program involvement."

More to the point, the psychological evaluation dated July 30, 2002, inexplicably eight months after her initial two-member panel hearing in November 2001, can only be regarded as inordinately supportive of release on parole. The report noted that appellant had no prior criminal history, that her institutional adjustment had been above average, that her interview behavior had been entirely appropriate and that she had been substance-free for nine years. The evaluation included the following clinical impression:

She continues to present as an intelligent, articulate woman who has completed numerous programs and courses during the nine years that she has been incarcerated. She continues to admit to committing the present offense and to trying to cover up the offense by lighting her car on fire. She also admitted to being under the influence of vodka and xanax at the time of her crime. The inmate was a child of an alcoholic who was physically abusive to his wife and mentally abusive to the inmate and her siblings. The victim of the present offense was reportedly physically and sexually abusive to the inmate from the ages of 13–18–1/2 years old. She was able to escape from him for about 14 years when he finally found her and proceeded to terrorize her and her family for the next 18 months. The inmate continues to express insight into the factors which contribute to and maintain domestic violence relationships. She expressed remorse about the crime and an

---

Quilt;" writer and director of "Something is Missing from Christmas," a Title XX special Christmas play for the children of imprisoned mothers; serving as the Women Becoming Aware Domestic Violence Survival Group's Quilting Project and Presentation guest speaker; March of Dimes Walk–a–Thon volunteer; and Theater Guild Committee secretary.

Her affiliations included Women's Crisis Services, New Jersey Coalition for Battered Women, The National Coalition Against Domestic Violence Grassroots Connection, and The National Clearinghouse for the Defense of Battered Women.

Her awards included the Inmate Worker of the Month Award, Para-Professional Award for Electronics, first place in Domestic Violence Poster Contest, first place in Domestic Violence Candle Light Vigil Tee–Shirt Design Contest, and the Perfect Attendance Award.

And her religious affiliations included the Flemington Jewish Community Center and the Aleph Institute.

intention to speak to other women about battered relationships. She does not appear to be an imminent risk of violence to self or others.

The evaluation also included the notation that appellant's judgment, impulse control, insight, institutional adjustment, and institutional programming were all "Good," and concluded with an "above-average" prognosis for successful completion of parole.

The July 30, 2002, evaluation was followed by an "In–Depth Psychological Evaluation" dated January 24, 2003. That evaluation reports that it was done on referral from the Parole Board in view of the Board's opinion that appellant "takes no responsibility for the current offense and attempts to answer questions in an elusive and manipulative manner. She portrays herself as a victim." The evaluation contains the following Summary/Conclusions section:

Test Behavior: Ms. Kosmin presented as diligent, engaged and self-demanding. She persisted through the actuarial components as well as lengthy clinical interview. She was eager to discuss any aspect of her life, exposing all vulnerabilities and areas to assure the examiner of the breath and depth of her revelations. Mood fluctuated throughout as the topics explored emotionally laden material of the most severe and extreme to the joy and pride of her favorable experiences. Affect was full range and appropriate to mood and content. There was evidence of anxiety, sadness, remorse, guilt and pain. There was no evidence of a formal thought disorder, suicide ideation or intent. Thought processes included methods of conclusion in inductive and deductive means. Abstract reasoning was fair. Speech was fluid, articulate and relevant. Eye contact was occasionally avoidant with staring to one spot on the floor during times of anxiety. She was primarily fully engaged in direct eye contact with the examiner.

General Intellectual Functioning: Ms. Kosmin's intellectual ability falls within the descriptive average range of intellectual ability. She is a very articulate woman who has achieved her high school equivalency after leaving high school at the age of 16 years (11th grade). She has good concentration and memory ability.

Personality Profile: Ms. Kosmin presents as a well adapted woman who is shaped by episodes of anxiety and fear of the potential and real dangers of life. Her temperament and deportment are primarily managed by keeping herself occupied with goal directed acts, programs and endeavors. Strong feelings of inadequacy and inferiority, longing for safe, reciprocated affection and struggling with dependency needs continue to foster her belief systems. Primary motivation is avoidance, forced compliance with authoritarian and authoritative norms and her internalized striving for high achievement. Defensive postures include having to ultimately accept the reality of what she admits to orchestrating. The chaotic organization of her previous lifestyle after 15 years of memory trace triggered by the victim beating her once again, exacerbated her dormant survival mechanisms.

Characterological structure has provided her with formulation of defense mechanisms that result in psychological, emotional, spiritual and physical survival. These are necessary processes that allow Ms. Kosmin to continue to exist with full knowledge of what she has done.

*Likelihood of Acting Out/Risk Behavior: Low Risk factors for re-offending include: No psychiatric commitment or major and/or acute psychiatric disorder. No know prior offenses of a violent nature, one victim of violence, violence not planned for the future. She expresses guilt over the aggressive behavior and remorse for the death of the victim as well as admitting to having the desire to kill another human being and being responsible for his death. She is not overtly hostile and has no disciplinary charges involving aggression or acting out. There is no thought disorder present and she is not prescribed psychotropic medication. She has been involved in individual counselling and is aware of the need for further psychotherapeutic treatment to assist in healing herself further as well as in her relationships with her daughter, father, step-father and her ex-husband (who has re-established a relationship with his adoptive daughter, Ms. Kosmin). Ms. Kosmin has participated in drug/alcohol abuse programs as well as other self-improvement, vocational skills building and educational programs. Ms. Kosmin presents as a low-risk for re-offending and having a solid plan for re-uniting with the community with a sound support system.* (Emphasis added.)

It is against the foregoing background that we review the actions of the Parole Board, both substantively and procedurally.

As we have noted, appellant's parole eligibility date was December 27, 2001. Her initial parole hearing before a two-member panel commenced on November 1, 2001, and was continued by video conference on November 7, 2001. There was no updated psychological evaluation. The case summary indicated the mitigation factors of no prior criminal record, no institutional infractions, participation in programs specific to behavior, and an adequate parole plan to assist in successful reintegration into the community. The Panel Decision dated November 7, 2001, although noting essentially the same mitigating circumstances, nevertheless denied parole and imposed a thirty-six month future eligibility term (FET). The reasons stated for the denial were the multiple crimes of which appellant was convicted and her continued denial that she was the shooter, circumstances the Panel equated with denial of the crime. The Panel therefore concluded that "a substantial likelihood exists that you would commit a new crime if released on parole."

On March 1, 2002, appellant's counsel requested a reconsideration of the Panel decision pursuant to *N.J.A.C.* 10:71–4.1. Although the request was acknowledged, it was not timely responded to. Consequently, counsel then advised the Board on April 5, 2002, that appellant would instead pursue an administrative appeal to the full Board. Ten days later the Board wrote to counsel telling him that the reconsideration request would be processed, and ten days after that letter, the Board advised counsel that reconsideration had been granted, the denial of parole was reaffirmed, but that an amended decision had been issued adding more of the mitigating factors we have already noted.

On June 7, 2002, the Board again wrote to counsel with the information that it had conducted the administrative appeal and had voted to send the matter back to the Panel in order for it to "clarify their reasons" for denying parole and establishing a thirty-six month FET. The response of the Panel to this directive, communicated to appellant's counsel on June 25, 2002, was to vacate its November 7, 2001, decision in its entirety and to conduct a *de novo* Panel hearing "as soon as administratively possible."

The second Panel hearing was conducted before the same two panel members on August 26, 2002. This time the Panel had the benefit of the first updated psychological evaluation to which we have referred. Parole was again denied and a twenty-seven month FET imposed. The check-sheet decision indicated continued determination of a substantial likelihood that appellant would commit another crime if released. Because the Panel took the further view that the FET would run from the date of its August decision, the nine-month reduction of the FET left appellant in precisely the same position she was in as a result of the Panel's November 2001 decision. We further note that appellant's counsel was not advised of the August 26, 2002, decision until he received a letter from the Board dated September 24, 2002 informing him thereof and promising a written notice of decision specifying the reasons for the parole denial "as soon as administratively possible." The next day, counsel filed a notice of appeal with this court from the

Panel's denial of parole although a second administrative appeal to the full Board had not been taken. The notice of appeal was accompanied by a motion seeking leave to proceed without the Panel's written decision because no decision had yet issued. We entered an order on November 21, 2002, denying that motion but requiring the written decision to be issued within twenty days.

Instead of complying with this court's order or seeking relief therefrom by proper application, the Board apparently chose simply to ignore it, vacated the August 26 decision, scheduled a third hearing on appellant's original parole application, and referred her for the in-depth psychological evaluation to which we have also referred. On January 7, 2003, we denied the Board's belated motion to dismiss the pending appeal for failure to exhaust administrative relief, and on January 31 the Panel conducted its third hearing, this time before two different panel members. The Panel decision, dated January 31, 2003, was again a denial of parole and, unaccountably, a return to a thirty-six month FET. The check-sheet again found a substantial likelihood that appellant would commit another crime if released, noted all the mitigating factors we have already referred to, and checked off as reasons for the denial the multi-crime conviction, lack of insight into criminal behavior, minimization of conduct, and insufficient address of substance abuse problems. The check-sheet decision was supplemented on March 6, 2003, by a further statement elaborating on these reasons. The multi-crime conviction, although the crimes were all part of a single criminal event, is a matter of fact. The purported basis of minimization of criminal conduct was appellant's refusal to admit that she was the actual shooter. The purported basis of lack of insight into criminal behavior despite appellant's remorse for the crime was her perception that she too had been a victim. Startlingly, the Panel's statement notes in this regard that "During your parole hearing you did not indicate whether the counselling that you undertook with other departments [of the institution] addressed you as the victim or your criminal behavior ... it appears that your focus has been centered on issues other than your criminal behavior." Finally, the pur-

ported basis for the substance abuse conclusion was, apparently, the Panel's dissatisfaction with appellant's explanation of the first-step of the NA/AA program because she had included part of the second step in her response. There was absolutely no mention of either of the two psychological evaluations.

The procedural posture of this appeal, already both irregular and complex by reason of the continuing administrative actions despite the pendency of the appeal, then became even more tortuous. To begin with, appellant asserts that all she is appealing is the denial of parole following the first two hearings, and, indeed, the notice of appeal was never amended to include the denial of January 31, 2003. We note that these were not successive independent hearings but rather, because of the Board's seriatim vacations, all part of the initial parole proceeding. Beyond that, despite all the time that has passed since the first hearing in November 2001 and counsel's efforts to bring the matter to a conclusion, the Parole Board itself had never issued a final administrative decision on the merits. Appellant, in an apparent abundance of caution in view of the Board's procedural anomalies and its failure to comply with an order of this court, requested a full Board appeal in March 2003 while this appeal was pending. At oral argument on June 3, 2003, we were advised for the first time that the Board had indeed granted that request, voted to deny parole, but had not yet issued its decision. Considering that appellant has been waiting since November 2001 for a final disposition of her parole application and that the Board has apparently, by design or mischance, thwarted her legitimate expectations of a timely final resolution of that application, we entered a scheduling order on that date requiring the Board to transmit its written decision to us by Thursday, June 12, 2003, and we gave counsel one day in which to respond to that decision if they so chose to do. We further provided that if no decision was timely forthcoming, we would infer that the Board had wished to add nothing further to the Panel decision and we would consequently regard the Panel decision following the January 31, 2003, hearing as the final administrative determination.

The Board's written decision was timely transmitted to us. In essence, it sets forth appellant's exceptions to the Panel's statement of reasons and nevertheless concurs in those reasons. With respect to the psychological evaluations, the decision suggests that they were properly disregarded because they were "heavily based on wholly unsubstantiated facts as self-reported by Ms. Kosmin to the Evaluator." Finally, the decision notes that appellant's next parole eligibility date is in November 2003.

Before considering the merits of this appeal, we are constrained to address the procedure of the Parole Board in response to our order of November 21, 2002, directing the filing with the court of a statement of reasons. As noted, the Parole Board opted to ignore that directive, to vacate its decision and to hold a new hearing. We simply point out that the Parole Board is a state administrative agency whose actions are reviewable by this court. *R.* 2:2-3(a)(2). Like the trial courts, state administrative agencies are free to disagree with our decisions. They are not, however, free to disregard them. *See, e.g., Petrusky v. Maxfli Dunlop Sports,* 342 *N.J.Super.* 77, 81, 775 *A.*2d 723, 725–26 (App.Div.), *certif. denied,* 170 *N.J.* 388, 788 *A.*2d 772 (2001); *Weir v. Market Transition Facility,* 318 *N.J.Super.* 436, 448, 723 *A.*2d 1231, 1237 (App.Div.), *certif. denied,* 160 *N.J.* 477, 734 *A.*2d 792 (1999);. If the Board was of the view that a new hearing was necessary in lieu of complying with our order to file a statement of reasons, there were procedures available to it which it was required to follow to achieve that end on notice to opposing counsel. It could have moved for reconsideration. It could have moved for a limited or final remand. What it could not do but chose to do was to challenge the legitimacy of the judicial system by ignoring the appellate court's order and going its own way despite that order. We can only hope that its procedural conduct was aberrational and will not be repeated.

We turn now to the merits. To begin with, it is clear that under the parole scheme now in effect, the punitive aspect of the sentence imposed on the defendant is deemed to be satisfied

by the time the parole eligibility date is reached. The dispositive issue governing the parole decision is whether the rehabilitative aspect of the sentence has been satisfied, and the basic test thereof is whether there is a substantial likelihood that the defendant will commit another crime if released on parole. *See N.J.S.A.* 30:4–123.53a, in its applicable version,[2] providing in pertinent part that:

> An adult inmate shall be released on parole at the time of parole eligibility, unless information supplied in the report filed pursuant to section 10 of this act or developed or produced at a hearing held pursuant to section 11 of this act indicates by a preponderance of the evidence that there is a substantial likelihood that the inmate will commit a crime under the laws of this State if released on parole at such time. In reaching such determination, the board panel or board shall state on the record the reasons therefor.
>
> [Footnotes deleted.]

*See also Trantino v. N.J. State Parole Bd.,* 166 *N.J.* 113, 189, 764 *A.*2d 940, 986 (2001), modified as to halfway house placement, 167 *N.J.* 619, 772 *A.*2d 926 (2001); *N.J. State Parole Bd. v. Cestari,* 224 *N.J.Super.* 534, 546–547, 540 *A.*2d 1334, 1341 (App.Div.1988).

The question then before us is whether the record supports by a preponderance of the evidence the Board's conclusion that if released on parole appellant will be substantially likely to commit another offense. In considering this question, we are well aware not only of the deference we are required to accord to the decisions of an administrative agency, but also that "Parole Board decisions are highly 'individualized discretionary appraisals.'" *Trantino, supra,* 166 *N.J.* at 173, 764 *A.*2d at 976 (quoting *Beckworth v. N.J. State Parole Bd.,* 62 *N.J.* 348, 359, 301 *A.*2d 727, 733 (1973)). Nevertheless, although the Board has broad discretionary powers, "its determinations are always judicially reviewable for arbitrariness" *Ibid.* No stricter standard of review applies

---

[2] The statute was amended in 1997, by *L.* 1997, *c.* 213. Since the crime here was committed prior to the adoption of the amendment, the 1979 version controls. The import of the amendment was, essentially, the adding as a basis for denial of parole the inmate's failure to cooperate in her own rehabilitation. We are satisfied that the denial of parole here would have been equally arbitrary under the amended statute.

to the Parole Board than to any other administrative agency. *Ibid. See also In re Parole Application of Hawley,* 98 *N.J.* 108, 112, 484 *A.2d* 684, 685–86 (1984). Since the statute creates a presumption of release on the parole eligibility date, the decision not to release must be regarded as arbitrary if it is not supported by a preponderance of evidence in the record. *Cestari, supra,* 224 *N.J.Super.* at 547, 540 *A.2d* at 1341–42.

We have carefully scrutinized this record. The preponderance of the evidence cannot support a finding of any likelihood, to say nothing of a substantial likelihood, that appellant would commit another crime if released. To the contrary, the preponderance of the evidence impels exactly the opposite prediction. First, we reject the Board's justification for disregarding the psychological evaluations that conclude that appellant presents a low risk of recidivism. The evaluations were done by professionals whose business it is to evaluate self-reported statements. Indeed, self-reported statements would appear to us to be what an interview with a psychiatrist is all about.

We also are of the view that the Parole Board cannot insist that appellant's insight into her criminal behavior is impaired by reason of the fact that she will not admit that she was the actual shooter. The fact of the matter is that appellant has admitted full responsibility for the crime and that the identity of the shooter, she or Molewicz, was never established. A defendant who refuses to admit an established or adjudicated fact is one thing. It is altogether another to refuse to admit a fact that may not be true when there is no reasonable way of knowing whether it is true or not. The identity of the shooter is, simply, neither objectively determined nor determinable. We further note in this regard the Panel's finding that it was incredible that a mere friend of appellant who had not herself been the subject of Kelly's abuse would actually have pulled the trigger. We see nothing in logic or common sense to make that act any more incredible than any other aspect of Molewicz's acknowledged participation in the crime.

The Board is also apparently troubled by appellant regarding herself as a victim. We do not intend to minimize appellant's crime in any way or to depreciate its seriousness. She took a life, and she has paid the penalty. But to deny her victim status is to ignore the dynamics of the relationship that led her to her extreme action. She was a victim. She was cruelly brutalized over an extended period of time by a man who can be realistically said to have virtually destroyed her life. The Board also makes much of appellant's asserted inability to recite the NA/AA steps, concluding that she thereby demonstrated "lack of articulable insight regarding her criminal behavior despite years of attending counseling sessions." In context, we regard that conclusion as a non-sequitur. The Board also viewed as significant the multiple crimes of which appellant was convicted. As we have noted, however, all were part of the same ongoing event, and in the context of this defendant and her background and this crime, we do not perceive how the attempted cover-up of the shooting makes it more likely that appellant will commit another crime if released.

The final conclusion of the Board was that while appellant "did immerse herself in counseling while incarcerated," the "Adult Panel was unable to deem from the record established at the Panel hearing an indication that she had sufficiently addressed the underlying causes of her criminal behavior...." We have difficulty in understanding just what the Board meant by this statement. The underlying cause of appellant's criminal behavior was her brutalization by Kelly. Beyond that, the Adult Panel might well have perceived the indication it was looking for had it considered the psychological evaluations it had ordered but then chose to ignore.

We do not lightly reverse a parole-denial decision by the Parole Board. Nevertheless, its implicit conclusion that appellant did not cooperate in her rehabilitation and its expressed conclusion that there is a substantial likelihood that she will commit another crime if released are so far off the mark and so fundamentally contradicted by the record as to compel us to do so here.

The final decision of the Parole Board denying Margaret Kosmin parole is reversed. The Parole Board having approved appellant's parole release plan, we direct that she be released on parole forthwith.