NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5645-16T2

SUNDIATA ACOLI, a/k/a
CLARK EDWARD SQUIRE,

      Appellant,

v.

NEW JERSEY STATE
PAROLE BOARD,

      Respondent.

_____

APPROVED FOR PUBLICATION

December 27, 2019

APPELLATE DIVISION

Argued September 9, 2019 – Decided December 27, 2019

Before Judges Fasciale, Rothstadt and Moynihan
(Judge Rothstadt dissenting).

On appeal from the New Jersey State Parole Board.

Bruce Ira Afran argued the cause for appellant.

Christopher Josephson, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Christopher Josephson, on the brief).

The opinion of the court was delivered by

FASCIALE, P.J.A.D.

In accordance with remand instructions from the Supreme Court, Acoli v. N.J. State Parole Bd. (Acoli II), 224 N.J. 213, 217 (2016), the New Jersey State Parole Board (the Board) conducted a full Board in-person hearing to complete Acoli's administrative parole process. The Court remanded solely on procedural grounds, disagreeing with our earlier determination that a full Board hearing was not required. Id. at 232. Acoli—a convicted murderer of a State Trooper—appeals from the Board's unanimous[1] June 21, 2017 final agency decision (final decision) denying parole and imposing a 180-month Future Eligibility Term (FET).

At the remand hearing, the Board extensively questioned Acoli about a multitude of subjects, including his prior assertion that he "blacked out," which Acoli maintained rendered him unable to remember how the trooper died. But at the full Board hearing, Acoli provided these details: he explained that while he struggled with the trooper, another trooper "probably" shot the trooper with a "friendly fire shot." That explanation—which necessarily required that he was conscious during the struggle when the "friendly fire shot" occurred—

---

[1] The individuals who comprised two- and three-member Board panels, which previously denied parole, did not participate in the full Board hearing. See N.J.S.A. 30:4-123.58(a) (stating that any Board member who participated in the decision from which the appeal is taken may not participate in the disposition of that appeal).

contradicted Acoli's previous assertion that a bullet grazed his head, rendering him temporarily unconscious.

Our review of the final decision comes to us on a different record. In addition to considering a critical confidential report by a new psychologist, the Board extensively questioned Acoli, which is demonstrated by the 286-page transcript of the hearing. The Board considered the entire administrative paper record, the new psychological evaluation, and, importantly, Acoli's own responses, leading it to conclude—based on a preponderance of the evidence—that there was a substantial likelihood that Acoli would commit another crime if paroled.

On this more developed record, we conclude the Board applied the correct law, the record contains substantial credible evidence to support its findings, and there is no basis to determine that the Board clearly erred in reaching its conclusion. The Board's final decision is not arbitrary, capricious, or unreasonable.

We therefore affirm.

I.

In 1973, Acoli murdered State Trooper Werner Foerster and assaulted State Trooper James Harper. After a lengthy trial, a jury found him guilty of

"murder; atrocious assault and battery; assault and battery; assault with an offensive weapon; assault with intent to kill; illegal possession of a weapon; and armed robbery." Id. at 218. Acoli received life in prison for the murder conviction. The judge imposed consecutive sentences of "ten to twelve years of imprisonment for his conviction for assault with intent to kill; two to three years of imprisonment [for his conviction] for illegal possession of a weapon; and twelve to fifteen years of imprisonment [for his conviction] for [the] armed robbery." Ibid. The aggregate sentence equaled life plus twenty-four to thirty years. Ibid.

In 2010, Acoli became eligible for parole.[2] A hearing officer referred the matter to a Board panel for a hearing. On March 4, 2010, a two-member Board panel interviewed Acoli and concluded that "a substantial likelihood exists that [he] would commit a new crime if released on parole at this time." Ibid. On July 7, 2010, a three-member Board panel set a 120-month FET.

---

[2] The Board previously denied Acoli parole twice. In a decision dated January 3, 1994, the Board cited Acoli's "continued antisocial behavior" and his failure to "change[] appreciably during [his] incarceration" as factors contributing to his substantial likelihood to commit a new crime if released. And in its written decision dated August 11, 2004, the Board noted that "[Acoli's] denials and version of events are contrary to logic and to the evidence at trial," and that he was "not credible on numerous factual matters." The Board denied him parole because of this, and because the Board thought that Acoli's "radical and revolutionary politics have not fundamentally changed."

Acoli appealed to the full Board, which conducted a "paper hearing." That hearing was substantially different than the Board's hearing on remand. The "paper hearing" entailed consideration of the record before the hearing officer and the two- and three-member panels. Unlike in the full Board hearing leading to this appeal, the Board did not hear testimony or create its own record. On February 23, 2011, the Board upheld the denial of parole and the establishment of the 120-month FET.

Acoli appealed to us. Looking at the administrative record and the merits of the Board's February 23, 2011 decision, we reversed the denial of parole and concluded the Board's basis for denying parole was arbitrary. This court then ordered the Board to set conditions for Acoli's parole. See Acoli v. N.J. State Parole Bd. (Acoli I), No. A-3575-10 (App. Div. Sept. 29, 2014) (slip op. at 10). On procedural grounds, the Board unsuccessfully sought reconsideration of our judgment, solely contending that a full Board in-person hearing was required before proceeding directly to release.

The Supreme Court granted the Board's petition for certification, interpreted N.J.S.A. 30:4-123.55(f),[3] and agreed with the Board that it was

---

[3] The statute provides in pertinent part:

(continued)

A-5645-16T2

entitled to conduct a full hearing. The Court remanded with instructions for a "full Board in-person review and hearing of a convicted murderer prior to his or her parole release." Acoli II, 224 N.J. at 217. As to the merits of Acoli's parole, the Court stated:

> We express no view on what the outcome of that full assessment should be. Whatever it shall be, there will be a right of appeal to the Appellate Division. If Acoli is denied parole, then that would be the appropriate time at which the Appellate Division might have occasion to consider whether the unusual remedy of judicially ordered parole of a convicted murderer might be in order. However, that possibility must await completion of the parole process in its entirety.
>
> [Acoli II, 224 N.J. at 232.]

On June 8, 2016, the Board conducted the hearing. Board members extensively questioned Acoli and gave him an opportunity to read a prepared statement. The Board considered the entire record before it, including the new

---

(continued)
> Notwithstanding the provision of any other law to the contrary, if an inmate incarcerated for murder is recommended for parole by the assigned board member or the appropriate board panel, parole shall not be certified until a majority of the full parole board, after conducting a hearing, concurs in that recommendation. The board shall notify the victim's family of that hearing and family members shall be afforded the opportunity to testify in person or to submit written or videotaped statements.

confidential psychological evaluation, which had a significant impact on the Board's decision.

On June 8, 2016, the full Board denied parole. On that date, the Board rendered its "Panel Decision," which reflects that the Board found—once again—that there existed "a substantial likelihood" that Acoli "would commit a new crime if released on parole." After further documenting the consideration of multiple mitigating factors, and as part of its conclusion that Acoli lacked insight into his criminal behavior, the Board stated:

> [Acoli] cannot articulate how he has changed his anti-social thought patterns. [He] [p]resents as continuing to believe his actions were justified. [He] has no understanding why he believed violence was necessary to affect social change, nor does he demonstrate understanding how his criminal thinking pattern has changed.

The next day, the Board notified Acoli that "establishing a [FET] within the Board's presumptive schedule may be inappropriate due to your lack of satisfactory progress in reducing the likelihood of future criminal behavior." The Board then referred the FET issue to the full Board. On November 16, 2016, the full Board established a 180-month FET, and on December 22, 2016, the Board rendered a comprehensive written decision for its FET determination.

7

In its final decision (addressed to defense counsel), the Board stated it was responding to Acoli's "administrative appeal . . . of the Board's June 8, 2016 decision to deny [Acoli] parole[,] and the Board's November 16, 2016 decision[,]" which established the 180-month FET. The Board rejected Acoli's argument that it failed to apply the "post-August 19, 1997" parole release standards. The Board stated:

> In accordance with New Jersey statutes, Administrative Code, and court decisions, the standard for parole where the committed offense(s) occurred prior to August 19, 1997, is whether the preponderance of evidence indicates a substantial likelihood that an inmate would commit a new crime if released on parole. The Board finds that [Acoli's] commitment offenses occurred in 1973 and that therefore, it is the "substantial likelihood" standard that applies to his case.

In its final decision, the Board acknowledged Acoli's additional contentions pertinent to the denial of parole. Acoli argued that the Board withheld confidential information, excluded favorable information, violated his due process rights, ignored material facts, and rendered an excessive FET. The Board acknowledged those arguments and addressed them in the final decision.

As to Acoli's assertion that the Board violated his due process rights, the Board explained that it "carefully and thoroughly reviewed all the reports contained in the case file," and reached its decision "on the totality of the

A-5645-16T2

information in the administrative record." The Board noted that as part of the full hearing on remand, it gave Acoli the opportunity to participate and provide information. Indeed, Board members thoroughly questioned Acoli, and he read a prepared statement that he and his friend drafted. The Board contended it did not violate his due process rights because it denied parole after fully applying the requirements of N.J.A.C. 10A:71-3.11 (setting forth multiple factors considered at parole hearings).

In the final decision, the Board rejected Acoli's argument that it failed to consider material facts. Acoli maintained that the Board did not consider his age, his lack of prior convictions for violent crimes, his listing as infraction-free in a lesser security status, his good institutional work record, and his parole plans. Acoli specifically contended that he led a crime-free life for roughly forty years, and that he took "full responsibility" for the trooper's death. The Board explained its reasons for denying parole, which we have partially quoted:

> [The] serious nature of offense (homicide of a law enforcement officer); prior offense record noted; nature of criminal record increasingly more serious; committed to incarceration for multiple offenses; prior opportunity on probation has failed to deter criminal behavior; and commission of current offense while on recognizance bail. Furthermore, based on [Acoli's] responses to questions posed by the Board at the time of the [full] hearing [on remand], the pre-parole report, and the documentation in the case file, the

9

Board determined that [Acoli] exhibited insufficient problem resolution, specifically, that he lacked insight into his criminal behavior; that he denied his offense, and that he minimized his conduct. The Board [repeated], "[Acoli] cannot articulate how he has changed his anti-social thought patterns. [Patterns] as continuing to believe his actions were justified. Has no understanding why he believed violence was necessary to affect social change, nor does he demonstrate understanding how his criminal thinking pattern has changed." The Board . . . relied on confidential material and, pursuant to N.J.A.C. 10A:71-2.2(c), identified for the record the nature of the confidential information. The Board also considered [Acoli's] risk assessment evaluation score of [twenty], which indicates a moderate risk of recidivism.

Additionally, the Board noted as mitigation: minimal offense record; all opportunities on community supervision completed without violations; infraction free since last panel; participation in programs specific to behavior; and participation in institutional programs.

. . . .

[T]he Board reviewed [Acoli's] entire record in rendering its decision. His age and personal and medical histories; his criminal history; his record of rehabilitative program participation (including each of those programs referenced in [his] [administrative] appeal); his current custody status and institutional work history; and his infraction-free status (since his last Board panel hearing); are all matters of record . . . . [T]he Board appropriately noted as mitigation on the Notice of Decision: minimal offense record; all opportunities on community supervision completed without violations; infraction free since last panel; participation in programs specific to behavior; and

participation in institutional programs. As a result, <u>the Board . . . did not solely base its decision to deny parole on the negative aspects in the record, rather, the Board . . . based its decision on the entire record</u> governed by the factors set forth in . . . N.J.A.C. 10A:71-3.11.

. . . .

[T]he Board . . . <u>consider[ed] [Acoli's] parole plans</u> . . . which includ[ed] his proposed place of residence and his employment plans [and] noted on the Case Assessment at the time of his [i]nitial [p]arole [h]earing . . . . Additionally, the Board routinely reviews the plans submitted by the inmate for consideration and is therefore aware of significant information such as employment plans, residence, community and family support.

. . . .

Lastly, [Acoli] contend[s] that the Board did not consider that [Acoli] has taken . . . "full responsibility" for [the trooper's] death . . . . <u>The Board . . . conducted [Acoli's] hearing to determine his suitability for parole</u>. <u>The Board had the ability to ask [Acoli] questions</u> and to review his case to evaluate whether he . . . gained the problem resolution necessary to ensure that there is not a substantial likelihood that he would commit a crime if released on parole. <u>The Board determined, based on its interview [of Acoli], and its review of the case file</u>, that [Acoli] does <u>not demonstrate the insight necessary to be a viable candidate for parole release at the present time</u>. Although he may believe that he has [] made progress [] sufficient to ready him for parole release, the Board found otherwise.

[(Emphasis added).]

Referring to its December 22, 2016 written decision establishing the 180-month FET, the Board stated that Acoli "demonstrated a lack of satisfactory progress in reducing future criminal behavior[,] and that therefore, pursuant to N.J.A.C. 10A:71-3.21(d), a [FET] within the statutorily provided guidelines [was] inappropriate[.]" Moreover, in rejecting Acoli's argument that the 180-month FET was excessive, the Board stated:

> [Acoli] continues to demonstrate no insight towards understanding the lifestyle and behavior choices that he was making leading up to the murder. While he states that he no longer advocates violence, he yet cannot provide tangible explanations as to how he has changed his behavior choices or patterns. [Acoli] has made only negligible progress into understanding why he chose to be a part of a violent militant organization. He does not appear to recognize what changes he needs to make to ensure a crime[-]free lifestyle. Further, he seems conflicted in his thinking and is unable to fully reconcile his behaviors and actions involved in the time leading up to the murder, and the murder itself. He repeatedly states that he takes ownership and responsibility for the murder of the trooper, but there are significant contradictions to those statements in his further testimony before the Board. He presents as being emotionless and lacking in empathy and does not appear to realize the severity of his violent actions. The Board finds that more work needs to be done on [Acoli's] part, in order for him to undergo a meaningful introspection into the internal and external factors that impelled his life choices.
>
> [(Emphasis added).]

Moreover, in its six-page December 22, 2016 notice of decision, the Board stated:

> [Y]ou have never before speculated as to who you believed shot and killed the trooper, instead maintaining that you were in an unconscious state when the act occurred. At the [remand] hearing, you chose to deviate from your past statements and speculated that the trooper was killed by friendly fire. Although the ballistic evidence reveals that could not be the case, as the trooper was shot with his own weapon, it is disturbing that you would make such conjecture, especially considering your assertions that you take responsibility for the crime.
>
> [(Emphasis added).]

Consideration of Acoli's suitability for parole release—albeit on a different record—returns to us on this appeal in the aftermath of the Board's final decision.

## II.

On this appeal, Acoli raises the following points:

> [POINT I]
>
> THE RECORD DOES NOT SHOW BY A PREPONDERANCE OF THE CREDIBLE EVIDENCE THAT [ACOLI] HAS A "SUBSTANTIAL LIKELIHOOD" OF COMMITTING FUTURE CRIME IF RELEASED.
>
> A. IN NEW JERSEY[,] PAROLE IS PRESUMED UPON REACHING THE ELIGIBILITY DATE AND THE BURDEN IS ON THE STATE TO PROVE [ACOLI] IS A RECIDIVIST.

B. THE RECORD DOES NOT SUPPORT A SHOWING THAT [ACOLI] IS "SUBSTANTIALLY LIKELY" TO BE A RECIDIVIST.

1. THE BOARD IMPROPERLY RELIED UPON REMOTE OFFENSES AS A BASIS FOR DENIAL OF PAROLE.

2. THE BOARD'S FOCUS ON [ACOLI'S] ALLEGED UNWILLINGNESS TO ADMIT THE PREMEDITATED NATURE OF THE OFFENSE DOES NOT ESTABLISH A SUBSTANTIAL LIKELIHOOD OF RECIDIVISM.

3. THE RECORD DOES NOT SUPPORT THE BOARD'S CONCLUSION THAT [ACOLI] HAS NOT OPENLY ACKNOWLEDGED AND ADMITTED [TO] HIS PAST ASSOCIATIONS WITH A VIOLENT POLITICAL MOVEMENT.

4. THE RECORD DOES NOT SUPPORT THE STATE'S NEW PSYCHOLOGIST'S CONCLUSION THAT [ACOLI] HAS FAILED TO MAKE SUFFICIENT GAINS FROM COUNSELING AND THERAPY.

5. THE BOARD'S BASIS FOR DENYING PAROLE IS SPECULATIVE AND DOES NOT RISE TO THE LEVEL OF PROOF THAT ACOLI IS "SUBSTANTIALLY[] LIKELY["] TO COMMIT FUTURE CRIME.

14

[POINT II]

[ACOLI'S] RECORD WHILE INCARCERATED FOR NEARLY [FORTY] YEARS MITIGATES AGAINST THE FINDING THAT HE IS "SUBSTANTIALLY LIKELY" TO COMMIT FURTHER CRIMES.

Our narrow standard of review is critical to adjudicating Acoli's arguments on appeal. Of course, parole determinations are subject to judicial review. When reviewing the Parole Board's denial of parole, we concentrate on three inquiries:

> (1) whether the agency's action violates express or implied legislative policies, i.e., did the agency follow the law; (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.
>
> [Trantino v. N.J. State Parole Bd. (Trantino IV), 154 N.J. 19, 24 (1998).]

We will reverse an administrative agency's decision "only if it is arbitrary, capricious, or unreasonable or [if] it is not supported by substantial credible evidence in the record as a whole." Henry v. Rahway State Prison, 81 N.J. 571, 579-80 (1980) (citing Campbell v. Dep't of Civil Serv., 39 N.J. 556, 562 (1963)).

15

We undertake that analysis understanding the uniqueness of the Parole Board. See Acoli II, 224 N.J. at 222-23 (explaining the specialized nature of the Parole Board). The Legislature purposefully established the Parole Board that collectively embodies unique and particular characteristics. Under N.J.S.A. 30:4-123.47(a), the Board consists of a chairperson, fourteen associate members, and three alternate board members. Acoli II, 224 N.J. at 222. The Governor appoints these individuals with the advice and consent of the Senate, and selects them based on their qualifications. Ibid. (citing N.J.S.A. 30:4-123.47(a)). Indeed, the statute requires that they be "qualified persons with training or experience in law, sociology, criminal justice, juvenile justice or related branches of the social sciences." N.J.S.A. 30:4-123.47(a).

We expressly draw attention to the qualification-based appointment of the Board members especially because here, the Board utilized its expertise and conducted a full in-person hearing, listened to Acoli's responses during the lengthy hearing, and observed Acoli interact with the Board. The Board members' individual, diverse, and combined expertise was important, as they undertook their weighty responsibility of deciding whether Acoli satisfied the criteria for parole release. The Parole Board is the only agency entrusted with the "specialized knowledge to administer [the] regulatory scheme." Acoli II, 224 N.J. at 222.

Based on the diverse background of its members, the Parole Board makes "highly predictive and individualized discretionary appraisals." Ibid. (quoting Beckworth v. N.J. State Parole Bd., 62 N.J. 348, 359 (1973)). The appraisals are inherently imprecise because they are "discretionary assessment[s] of a multiplicity of imponderables, entailing primarily what a man is and what he may become rather than simply what he has done." Ibid. (alteration in original) (quoting Greenholtz v. Inmates of Neb. Penal & Corr. Complex, 442 U.S. 1, 10 (1979)). "Stripped to its essentials, a parole board's decision concerns a prediction as to an inmate's future behavior, a prognostication necessarily fraught with subjectivity." Ibid. (quoting Trantino v. N.J. State Parole Bd. (Trantino VI), 166 N.J. 113, 201 (2001)) (Baime, J.A.D., dissenting).

Given the subjective nature of the Board's prediction of an inmate's future behavior, and the highly specialized composition of the Board itself, we are not permitted to substitute our judgment for that of the Board's. Indeed, in the Court's remand, it stated:

> By virtue of our remand, we ensure that subsequent judicial review, if critical of the substance of that ultimate determination by the Parole Board under the applicable standard of review, does not impermissibly result in a judicial substitution of a decision reposed by the Legislature with the Parole Board. The Appellate Division here declined to remand to the

A-5645-16T2

Parole Board for a full hearing, as was requested on reconsideration by the Parole Board. The panel, essentially, saw no point to that step, having itself evaluated Acoli's bases for asserting that he is ready for release and determining that there has been no convincing reason presented to date to require his further incarceration. That remedy basically substituted the appellate panel's judgment for that of the agency charged with the expertise to make such highly predictive, individualistic determinations—the full Parole Board.

[Acoli II, 224 N.J. at 230-31.]

We note that Acoli is serving a sentence imposed under Title 2A, the predecessor to the New Jersey Code of Criminal Justice, now codified under Title 2C. The Parole Act of 1979, N.J.S.A. 30:4-123.45 to -123.79, governs Acoli's parole fitness, and provides for parole of an inmate upon eligibility unless a preponderance of the evidence demonstrates "there is a substantial likelihood that the inmate will commit a crime under the laws of this State if released on parole at such time." N.J.S.A. 30:4-123.53 (amended 1997). The Board utilized this correct standard during the remand proceedings.

Here, the Board also complied with all other applicable law, including N.J.A.C. 10A:71-3.11. The regulation, entitled "Factors considered at parole hearings; adult inmates," states:

(a) Parole decisions shall be based on the aggregate of all pertinent factors, including material supplied by the inmate and reports and material[,] which may be

18

submitted by any persons or agencies which have knowledge of the inmate.

(b) The hearing officer, Board panel or Board <u>shall consider the following factors and</u>, in addition, <u>may consider any other factors deemed relevant</u>:

> 1. Commission of an offense while incarcerated.
>
> 2. Commission of serious disciplinary infractions.
>
> 3. Nature and pattern of previous convictions.
>
> 4. Adjustment to previous probation, parole and incarceration.
>
> 5. Facts and circumstances of the offense.
>
> 6. Aggravating and mitigating factors surrounding the offense.
>
> 7. Pattern of less serious disciplinary infractions.
>
> 8. Participation in institutional programs which could have led to the improvement of problems diagnosed at admission or during incarceration. This includes, but is not limited to, participation in substance abuse programs, academic or vocational education programs, work assignments that provide on-the-job training and individual or group counseling.
>
> 9. Statements by institutional staff, with supporting documentation, that the inmate is likely to commit a crime if released;

that the inmate has failed to cooperate in his or her own rehabilitation; or that there is a reasonable expectation that the inmate will violate conditions of parole.

10. Documented pattern or relationships with institutional staff or inmates.

11. Documented changes in attitude toward self or others.

12. Documentation reflecting personal goals, personal strengths or motivation for law-abiding behavior.

13. Mental and emotional health.

14. Parole plans and the investigation thereof.

15. Status of family or marital relationships at the time of eligibility.

16. Availability of community resources or support services for inmates who have a demonstrated need for same.

17. Statements by the inmate reflecting on the likelihood that he or she will commit another crime; the failure to cooperate in his or her own rehabilitation; or the reasonable expectation that he or she will violate conditions of parole.

18. History of employment, education and military service.

19. Family and marital history.

A-5645-16T2

20. Statement by the court reflecting the reasons for the sentence imposed.

21. Statements or evidence presented by the appropriate prosecutor's office, the Office of the Attorney General, or any other criminal justice agency.

22. Statement or testimony of any victim or the nearest relative(s) of a murder/manslaughter victim.

23. The results of the objective risk assessment instrument.

[N.J.S.A. 10A:71-3.11 (emphasis added).]

"Common sense dictates that [the Board's] prediction as to future conduct . . . be grounded on due consideration of the aggregate of all of the factors which may have any pertinence." Beckworth, 62 N.J. at 360.

III.

In denying parole, the Board heavily relied on Acoli's insufficient problem resolution. After completing its in-person interview of Acoli, the Board concluded that he lacked insight into his criminal behavior, denied key aspects of his crimes, and minimized his criminal conduct and anti-social behavior. The Board found Acoli did not answer questions at the hearing spontaneously, paused "before answering each question," and was "often hesitant to provid[e] details to even the simplest of questions." The Board

21

determined that his responses were "superficial in nature and appeared rehearsed in their structure."

## A.

As to his continued denial of key aspects of his crimes, and his minimizing of his criminal conduct and anti-social behavior, we emphasize the difference between Acoli's present assertions and his previous statements in past hearings. Previously we addressed whether Acoli's "forty-year-old recollection of the events [was] likely to change." We stated:

> The Board appeared to rely most heavily on its evaluation that Acoli lacked insight into his criminal behavior as he minimized his conduct and denied "key aspects of his commitment offenses." Specifically, the Board points out that he did not accept responsibility for his crimes because Acoli's version of the crimes was not consistent with the established facts[.]
>
>     . . . .
>
> Acoli has <u>alleged that</u> he did not see who fired first as he was on the other side of the car; <u>during the struggle with Foerster he was grazed by a bullet that rendered him temporarily unconscious</u>; and when he regained consciousness Foerster was dead, and Harper had retreated. Nevertheless, <u>he has accepted full responsibility for the murder of Foerster</u> and admitted he should not have struggled with the trooper and prevented him from aiding Harper.
>
>     . . . .

The Board's reasoning that Acoli is likely to commit another crime if he does not recall the State's version of his crime has the draconian effect of condemning him to prison for the rest of his life.

[Acoli I, slip op. at 8-9 (emphasis added).]

In our unpublished opinion, we acknowledged the difficulty of considering parole of an inmate who admitted his role in murders, but also claimed he was unable to remember details of the crimes:

[I]n Trantino IV, . . . the Board "based its successive denials of parole in large measure on the fact that Trantino was avoiding responsibility for [his] crimes." 154 N.J. at 33-34. The Board refused to grant parole until Trantino fully admitted his role in his murders, which Trantino did not deny responsibility for, but claimed that he could not remember the details of because of the drugs and alcohol he had consumed that night. Id. at 34-35. Since Trantino's absence of memory was consistent, the Supreme Court found that he could not and would not "ever be able to remember actually pulling the trigger." Id. at 35, 38. As such, the Court precluded the Board from relying on his lack of recollection in its parole denial. Trantino VI, . . . 166 N.J. at 193-94.

[Acoli I, slip op. at 9 (alteration in original) (emphasis added).]

The Board members questioned Acoli about Trantino at the full Board in-person hearing. Acoli stated, "[Trantino is] a very well-known case . . . I know a little about it now . . . because I read it and [it is] a famous case." At the hearing Acoli asserted that he "blacked out" from a grazed bullet, which

23

purportedly rendered him temporarily unconscious and therefore unable to know who killed the trooper. A Board member stated that Acoli's assertion—that he could not remember since he "blacked out"—was remarkably similar to Trantino's inability to remember the details of the underlying crime.

The Board had difficulty believing Acoli "blacked out" and was rendered unconscious because of a grazed bullet. The Board also found it "disturbing" that Acoli "deviate[d] from [his] past statements and speculated the trooper was killed by friendly fire." The Board noted Acoli previously asserted he "blacked out" before the trooper was shot, which is inconsistent with his statement at the hearing that the trooper was probably killed while Acoli struggled with him. In other words, Acoli—unlike in Trantino—did not have a consistent "absence of memory."

Q. [Trooper Foerster] began to pat you down?

A. Right.

Q. Okay. And what . . . did he find?

A. He found the [ammunition] clip in my belt pocket, and the [loaded] 380 [semiautomatic handgun] in my right pocket.

    . . . .

Q. What happen[ed] next?

A. [H]e seemed to get mad, and I think he swung and hit me with [a] roundhouse right upside the head on my . . . temple.

. . . .

Q. So he hit you with the gun[?]

A. Right . . . with his gun.

. . . .

Q. [Y]ou heard shots fired, correct?

A. Right, um-hum.

. . . .

Q. [W]here did the first gunshots come from, do you know?

A. No, I don't know.

. . . .

Q. [Y]ou knew it was not from Trooper Foerster[?]

A. Right, um-hum.

Q. Okay. So then what did you do in response to . . . the shots being fired?

A. I immediately grabbed [Trooper Foerster's] gun that he was whipping me with by the barrel, and pushed it to the side.[4] And just as I pushed [it] to the side, [Trooper Foerster] fired . . . in[to] my [right] hand.

_____

[4] Trooper Foerster died from two bullets that came from his own gun.

. . . .

Q. And where was your weapon at the time?

A. [Trooper Foerster] had it in his left hand.

. . . .

Q. [Y]ou thought you were protecting yourself?

A. [Y]eah, in other words I figured . . . I didn't want him to shoot me.

Q. How many times did he hit you with his weapon?

A. [T]wo or three[.]

. . . .

Q. [H]e gave you a roundhouse, you said before.

A. Right, uh-huh.

Q. Are you saying he followed that up with two or three more blows?

A. Uh, yeah[.]

. . . .

Q. Did you hear [the gunshots] stop[?]

A. Yeah. . . . [Trooper Harper] was aiming a gun at me, and then a – puff of smoke, just seemed as [if] it came out – out of the barrel, and I blacked out.

At the hearing, Acoli stated that he regained consciousness after Trooper Foerster was shot, then he returned to his car and helped his two passengers

26
A-5645-16T2

into it, and then drove three-to-five miles away.  The Board questioned Acoli about these details:

Q.  [W]hat did you do next?

A.  [I could not] see because the blood was running all in my eyes[.]

Q.  Because blood was running into your eyes –

A.  Right.

Q.  – from the wound on your –

A.  Right, on my –

Q.  – person?

A.  Yeah, on my head.

Q.  Where were you wounded?

A.  Uh, where the bullet grazed my head[.]

. . . .

Q.  But I'm looking at the pictures here when you were taken into custody, and there are no marks on your face . . . .  [W]hy don't [you] think you had marks on your face if somebody pistol-whipped you?

A.  Because, uh – okay, the first time he hit me, he hit me with the flat of the gun . . . up the side of [my] temple.  And then – and the next ones, I kind of – kind of blocked it . . . .  And by then, uh, a little shortly after that, the gunfire broke out on the other side of the car[.]

Q. But you also said [Trooper Foerster] shot you [in your hand].

A. Yeah, he did[.]

. . . .

Q. [Trooper] Foerster's gun was a six-shot Colt revolver . . . and only had two spent rounds in the cartridge, and both of those bullets were . . . taken out [of] his head . . . . There was no third shot, sir.

A. Then, uh – I don't know, you know.

. . . .

Q. [Y]ou're claiming that . . . Trooper Harper shot[] at you?

A. Yes[.]

Q. Okay.

A. [Trooper] Harper hit me in the head with the gunshot.

. . . .

Q. [But] [t]here's no reference to [your head wound] in the trial record. Why is that?

. . . .

A. [A]t the time I went to trial[,] . . . [my lawyer] was useless.

. . . .

Q. "[Trooper Foerster] had head bore abrasions on the left cheek, lacerations at the top of the forehead, the

28

mid forehead, and the left side of the head . . . . He had bruises and abrasions on both hands."  Upon your arrest, "[t]he only injury found was a cut on the webbing between [your] right thumb and forefinger. Otherwise, [you were] unmarked and uninjured."

A.  All I know is [Trooper Foerster] assailed me.

. . . .

Q.  Well, then how did he have so many bruises and bumps, and you only [had] one?

A.  I had more, they weren't – they didn't record those.

Q.  You think they're lying [about your injuries]?

. . . .

A.  They're lying about it.

At a later point during the full hearing, Acoli explained to the Board for the first time that Trooper Foerster was killed <u>during</u> Acoli's struggle with him—which necessarily means that he was not unconscious when the trooper was shot.

Q.  Who do you think killed Trooper Foerster?

. . . .

A.  I think he was probably shot by Trooper Harper.

. . . .

Q.  You really think that?

A.  Yeah, um-hum.

Q. <u>While you were struggling with him</u>?

A. <u>Um-hum</u>.

[(Emphasis added).]

Acoli provided inconsistent responses. He alleged that "during the struggle with Foerster he was grazed by a bullet that rendered him temporarily unconscious[,] [and] when he regained consciousness[,] Foerster was dead[.]" <u>Acoli I</u>, slip op. at 8. But at the full hearing, he said that Trooper Harper shot Trooper Foerster <u>while</u> Acoli was struggling with Trooper Foerster.

The Board therefore determined that Acoli appeared to "emotionally block[] any association to the murder by deflecting any acceptance of personal liability or responsibility." At the hearing, instead of maintaining that he was unconscious when the killing occurred, and therefore he did not know who killed the trooper, Acoli explained that the trooper was shot <u>during</u> the struggle. As to Acoli's explanation for how Trooper Foerster was killed, the Board stated:

> Although the ballistic evidence reveals that could not be the case, as the trooper was shot with his own weapon, it is disturbing that you would make such conjecture, especially considering your assertions that you take responsibility for the crime. Based upon the fact that you present as not having conducted a complete critical analysis of yourself and the internal and external factors that control your behaviors, the Board finds that more work in this area must be completed.

The Board was troubled by Acoli's responses and mannerisms, his refusal to accept responsibility for Trooper Foerster's murder, and his inability to elaborate on his behavioral growth. The Board found that Acoli's "presentation" at the hearing was insincere, as his "answers were not spontaneous and [he] paused before answering each question[.]" As to his rehearsed responses, the Board questioned him about his efforts to use his counseling to become more convincing. The following colloquy occurred:

> Q. [Y]ou expressed . . . that you wanted to work on counseling, and it says [in the counseling report] that "[y]ou came up with the idea that you're not convincing enough during your parole hearings, and wanted to know, through counseling, how to be more convincing in the parole hearings."
>
> A. Um –
>
> . . . .
>
> Q. [W]hat were you trying to be convincing about?
>
> A. I don't know[.]

After assessing his manner during the hearing, the Board found that Acoli's "presentation" was "shallow and emotionless."

To support its conclusion that Acoli lacked insight into his criminal behavior, the Board pointed out that Acoli failed to take responsibility for

shooting Trooper Foerster—especially since he apparently was not unconscious during the shooting of Foerster. Rather, Acoli took responsibility for struggling with the trooper, which he then maintained led to Trooper Harper killing Trooper Foerster. Nevertheless, the Board found that the ballistics evidence showed otherwise. Importantly, the Board questioned how Acoli could say—if he "blacked out" before the killing—that he believed Trooper Harper accidentally shot Trooper Foerster.

> Q. [Y]ou're not responsible for the death, are you?
>
> A. Responsible for the death? Yeah, I'm responsible for the death. Part of it because, uh, uh, I guess I – if I hadn't struggled with him, he could have likely went and helped his partner . . . and he might have lived. But I don't really see how he could've went and helped him until he took care of me, one way or the other. And I think the quickest way to take care of me would've been to have shot me, and get me out of the way, and go help his partner. But by me struggling with him, it did, uh, possibly keep him from living. And I'm probably, you know, the cause of his death.
>
>     . . . .
>
> Q. I don't understand how a man can do [forty-three] years [in prison] and still act like he didn't [shoot the trooper].
>
> A. I took responsibility for it.
>
> Q. How can you take responsibility, sir, for something you say you didn't do?

A. I – uh, I explained what I said – that I did, that I struggled with him, and prevent[ed] him from going to the aid of his –

Q. Sir, you didn't get life for a struggle. You got life for the murder, for putting the bullets in his head, that's what you got life for.

A. I didn't put the bullets in his head.

Q. But that's what you got life for.

A. Um, that's what I took responsibility for then.

These concerns, in part, led the Board to conclude Acoli lacked sufficient problem resolution, "specifically, that he lacked insight into his criminal behavior."

On remand, the Board obtained a new psychological evaluation pursuant to N.J.A.C. 10A:71-3.7, which states "[a]t any time while an inmate is committed to the custody of the Commissioner, the appropriate Board panel or the Board may require, as often as it deems necessary, the inmate to undergo an in-depth pre-parole psychological evaluation conducted by a psychologist." The new report—a confidential report that was not part of the previous administrative record—is unquestionably less favorable to Acoli than the 2010 evaluation. This new report, by a different psychologist, which we have fully reviewed, played an indispensable part in the Board's final decision.

33

Although Acoli contends that the Board did not fully consider mitigating evidence, the record reflects otherwise. The Board reviewed his program participation, prison history, pre-parole reports, and respective notices of decisions and case assessments. The Board was aware of Acoli's rehabilitation efforts when it conducted the full Board in-person hearing. It is undisputed that Acoli participated in programs during incarceration. As the Board pointed out in its final decision:

> [T]he Board reviewed [Acoli's] entire record in rendering its decision. His age and personal and medical histories; his criminal history; his record of rehabilitative program participation (including each of those programs referenced in your appeal); his current custody status and institutional work history; and his infraction-free status (since his last Board panel hearing); are all matters of record, were noted in the pre-parole report, the parole case file, and/or the Case Assessment at the time of his Initial Parole Hearing, and were considered by the Board. Based on the information on record, the Board appropriately noted as mitigation on the Notice of Decision: minimal offense record; all opportunities on community supervision completed without violations; infraction free since last panel; participation in programs specific to behavior; and participation in institutional programs.

After fully questioning Acoli and considering the entire record—especially the new psychological evaluation—the Board exercised its expertise and concluded that the aggravating factors, specifically his insufficient problem resolution, outweighed the mitigating factors.

A-5645-16T2

After we noted that "Acoli acknowledged that at the time of the crimes he was involved in revolutionary groups, was armed with a weapon, and was traveling with a wanted fugitive[,]" Acoli I, slip op. at 8, we stated—based on the administrative paper record—that "Acoli consistently espoused the same sequence of events since his arrest[.]" Ibid. But that is no longer the case. Instead of consistently saying that "a bullet . . . rendered [Acoli] temporarily unconscious[,] . . . and when he regained consciousness [Trooper] Foerster was dead," ibid., Acoli stated that Trooper Harper accidentally shot Trooper Foerster while Acoli struggled with Trooper Foerster.[5]

Finally, the Board concluded that Acoli could not articulate how he changed his anti-social patterns. Considering Acoli's previous participation in a "radical organization," the Board thought it was important to assess "the manner in which [Acoli would] conduct [himself] and address and process confrontational situations or situations involving societal conflict." The Board stressed that "upon release, [Acoli] may be faced with similarly charged

---

[5]   In our prior opinion, we stated that "[t]here were no eyewitnesses to [Trooper] Foerster's shooting[,] and [that] the Middlesex County Prosecutor[,] in a letter to the Board opposing Acoli's parole before the hearing, pointed out that [Acoli's passenger] might have fired [Trooper] Foerster's gun." Acoli I, slip op. at 8 n.9. But at the full hearing, the Board questioned Acoli about whether one of his passenger's shot [Trooper] Foerster, and Acoli remained steadfast that, in a "[f]riendly fire shot," Trooper Harper "probably" shot Trooper Foerster while Acoli struggled with Trooper Foerster because Trooper Harper "was doing . . . all the shooting."

35                                                      A-5645-16T2

situations regarding social injustice and community activism." Therefore, the Board felt it was necessary to understand how Acoli's views on violence and activism changed throughout his confinement. The Board found that he continued to believe his actions were justified, he had no understanding of why violence was necessary to affect social change, and that he failed to show how his criminal thinking pattern changed. The Board questioned him on these topics. For example, the Board addressed a Criminal Thinking Program Acoli participated in.

> Q. [Do you remember] taking the Criminal Thinking Group [class]?
>
> A. . . . I do remember taking Criminal Thinking.
>
>    . . . .
>
> A. I can't remember . . . many details [of] it.
>
> Q. Details about what? I'm just asking about the Criminal Thinking Program.
>
> A. That's what I mean, that – uh, all that I know is that I knew – I know that – that I took it.
>
>    . . . .
>
> Q. [W]hat [did] you learn[] in it?
>
> A. . . . I'm not absolutely sure, but I think it probably had to do with, um, criminal mentality[.]
>
> Q. . . . I want to know how it helped you, and what it changed in your way of thinking, and making

36

decisions, and how you look at the issues that you've been involved in[.]

A. Okay. All I . . . can really know is I don't [have] intentions of being involved in any criminal activity.

Q. . . . I'm more interested in what you've learned [from the program] [b]ecause you say that you've completed the program [but the record] says here that you didn't[.]

. . . .

Q. [Y]ou can't tell me what you've learned, but can you explain to me how your criminal thinking has changed?

A. Uh –

. . . .

Q. Explain to us, please, what have you learned from that class?

A. Um, offhand, I'd have to say that you don't break the law. It has something to do with not breaking the law.

Acoli continued that one should "stay away from the violence" and avoid "getting something for nothing."

IV.

Our dissenting colleague concludes that our opinion "inflicts a blow to the integrity of our justice system[.]" Post at ___ (slip op. at 1). The premise of his conclusion is that the remand proceedings amounted to "nothing more

37

A-5645-16T2

than a 'show hearing,' [which] only resulte[d] in the denial of parole again 'for no rational or just purpose.'" Ibid. Our colleague asserts that we "abandon[ed] our guiding principles" and have "contravene[d] the public policy behind the Parole Act[.]" Id. at ___ (slip op. at 1-2). To the contrary, we have systematically adhered to decades of precedent, applied our long-standing standard of review, and resisted the temptation to substitute our judgment for that of the "agency charged with the expertise to make such highly predictive, individualistic determinations—the full Parole Board." Acoli II, 224 N.J. 230-31. We therefore, respectfully, strongly disagree with his characterization of our decision—or for that matter—his implication that the Board simply went through the motions on remand.

As the new record reflects, our colleague erroneously suggests the Board denied parole solely because Acoli "refus[ed] to accept the facts as found by the jury."[6] Post at ___ (slip op. at 13). He is concerned that "other prisoners

_____

[6] Our colleague relies on Kosmin v. N.J. State Parole Bd., 363 N.J. Super. 28, 42 (App. Div. 2003) for the proposition that "[t]he Parole Board cannot insist that [an inmate]'s insight into [his] criminal behavior is impaired by reason of the fact that [he] will not admit that [he] was the actual shooter." Post at ___ (slip op. at 12). The Board here did not find Acoli's "criminal behavior was impaired" as a result of his unwillingness to admit he shot the trooper. Instead, the Board relied on the new psychological report—as well as the entire new record—and concluded that Acoli suffered from insufficient problem resolution (despite his rehabilitation efforts). And importantly, Kosmin is factually distinguishable. In Kosmin, the defendant pled guilty, and

(continued)

who . . . look to the Parole Board's actions [will] see no reason to hope that they will be paroled when eligible[.]" Id. at ___ (slip op. at 15-16). Our colleague has determined that because the Board purportedly ignored Acoli's "development and rehabilitation [efforts] since he committed his crime," and has instead denied parole based "upon the crime itself," there may be no incentive for "model prisoners[] like Acoli" to "maintain order." Id. at ___ (slip op. at 6). Our colleague believes this may lead to a "possibility" of creating a risk of resurgence in prison unrest. Id. at ___ (slip op. at 6-7). This is not a situation where the Board found Acoli was a "model prisoner[]," ignored his rehabilitation efforts, and then denied him parole "for no rational or just purpose." Id. at ___ (slip op. at 1, 6).

We disagree with our colleague's assertion that "the record . . . has remained virtually unchanged since [this court] visited this matter in 2014." Id. at ___ (slip op. at 1). One obvious difference is the new psychologist report, which added different critical insight for the Board's consideration.

_____

(continued)
the Board considered a psychological report that explained the defendant displayed "evidence of anxiety, sadness, remorse, guilt and pain"; that her "[s]peech was fluid, articulate and relevant"; and that "[s]he was primarily fully engaged in direct eye contact with the examiner." Kosmin, 363 N.J. Super. at 35.

Indeed, our colleague concedes that the new report—obtained properly by the Board under N.J.A.C. 10A:71-3.7—"formulated a much less favorable opinion about Acoli than the [psychological] report the Board considered in 2011." Id. at ___ (slip op. at 10). The dissent points out that the new report does not use the words "friendly fire." Id. at ___ (slip op. at 11 n.6). Rather than focusing on what the report did not say, the Board concentrated on what the psychologist actually said.

Let us be clear. Our colleague states that the new psychologist did not mention in her report that "Acoli said anything about 'friendly fire.'" Ibid. Instead, she reported he could "not even fathom who could have possibly pulled the trigger." This is diametrically opposed to his unequivocal statement to the full Board—given just a couple of months after the psychological interview—that Trooper Harper "probably shot" Trooper Foerster while (not after) Acoli struggled with Trooper Foerster. Acoli did not say to the Board that Trooper Harper shot Foerster while Acoli was unconscious; he said that Harper "probably" shot Foerster during the struggle because Harper "was doing . . . all the shooting." Questioning him about the shooting is not surprising, especially because Acoli himself placed his credibility in play when he said he blacked out.

40

There was nothing perfunctory about the new report. To the contrary, the psychologist rendered her twelve-page, single-spaced report after interviewing Acoli on two days, reviewing approximately twenty-one documents (including the previous psychology report referred to by our colleague), and performing a psychometric evaluation. The Board's reliance on her clinical opinions and recommendations undermines our colleague's determination that the Board somehow denied parole "for no rational or just purpose." Id. at ___ (slip op. at 1).

Another obvious important difference is that during the last hearing before it, the Board conducted a lengthy in-person hearing at which all the members questioned Acoli about a variety of subjects. We must not lose sight of what that means. The Board based its findings—that his responses were insincere, rehearsed, shallow, and emotionless—on each Board member's first-hand opportunity at the hearing to observe and listen to his testimony, things that no reviewing court (without being there) can perceive by simply reading a transcript. The Board assessed Acoli's demeanor and mannerisms and concluded he gave contradictory and implausible responses, especially about blacking out.

This record—not the earlier one—supports the difficulty the Board had believing Acoli blacked out. That is so because the Board learned for the first

41

time that Acoli remembered almost everything else. For example, he remembered being pulled over; exiting his car with a loaded semiautomatic weapon; and walking towards Trooper Foerster. He recalled Trooper Foerster struck him with a roundhouse "upside my head," and that the Trooper "whipp[ed]" him two or three times with the "barrel" of Trooper Foerster's gun (although the photographs showed no injuries to his head or face). He identified the hand in which Trooper Foerster was holding a gun. He explained he heard gunshots, saw gun smoke and Trooper Harper's face, and that Trooper Harper fired at him, grazing his head with a bullet, which Acoli said rendered him unconscious. He testified that Trooper Harper "probably shot" Foerster in friendly fire, and specifically denied that his two passengers could have done so. Acoli testified that he regained consciousness after Trooper Foerster died, returned to his car, helped his passengers into his car, and drove three-to-five miles away from the scene of the murder, where the police captured him hiding in the woods. His entire testimony supported the Board's finding that he "emotionally blocked any association of the murder," which directly supported its conclusion that he minimized his criminal conduct and anti-social behavior.

Finally, the Board focused on Acoli's rehabilitation efforts and concentrated on his continued insufficient problem resolution. Our colleague

points out that Acoli participated in "at least 100 different programs for self-improvement as well as vocational training[.]" Id. at ___ (slip op. at 11 n.5). And he is right. But when the Board asked him open-ended questions, specifically what he had learned from his Criminal Thinking Group class, Acoli said "I'm not absolutely sure . . . [i]t has something to do with not breaking the law." Thus, contrary to our colleague's belief that the Board denied parole only because Acoli did not admit to the shooting, the Board relied on all of his testimony—and its review of the entire case file—and concluded Acoli failed to demonstrate the necessary insight into his incomplete problem resolution progress, and denied parole "at the present time."

Emphasizing that we are not to substitute our judgment for that of the full Parole Board, we will not do so here. Acoli II, 224 N.J. at 230-31. It is clear from the record before us that the Board did not act arbitrarily or capriciously in denying Acoli's parole application. Indeed, there is ample support in the record for the Board's determination that there is a substantial

43

likelihood that Acoli will commit another crime under the laws of this State if the Board grants him parole.[7] See N.J.S.A. 30:4-123.53(a).

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

---

[7] We note the Board's December 22, 2016 FET decision states that Acoli's projected parole eligibility date was in March 2019; and he is entitled to annual parole reviews. The Board stated:

> It is strongly encouraged that you participate in these reviews. If the Board panel determines at your annual review that you have made progress towards your rehabilitation, the Board panel may authorize a reduction in the [FET]. Also, the Board panel has the option of referring your case for a parole release hearing.

**ROTHSTADT, J.A.D. dissenting**.

As Justice Albin observed in his dissent from the Court's opinion in Acoli v. New Jersey State Parole Board (Acoli II), 224 N.J. 213 (2016), "this case is about more than one individual.  It is about the integrity of our justice system."  Id. at 241 (Albin, J., dissenting).  The majority's opinion today, affirming the Parole Board's latest denial of parole to Acoli, inflicts a blow to the integrity of our justice system by fulfilling Justice Albin's prediction, in the same dissent, that the Supreme Court's remand to the Parole Board in Acoli II would amount to nothing more than a "show hearing," and only result in the denial of parole again "for no rational or just purpose."  Id. at 240.

Although the majority affirms the Parole Board's decision under its view that new information justified the Parole Board's actions, its perception is belied by the record that has remained virtually unchanged since we last visited this matter in 2014.  See Acoli v. N.J. State Parole Bd. (Acoli I), No. A-3575-10 (App. Div. Sept. 29, 2014).  Moreover, despite the fact that in 1974, Acoli's sentence could not legally have been life without parole, the impact of the majority's opinion affirming the Parole Board's actions, which were based upon the "strong winds of public opinion," Acoli II, 224 N.J. at 241 (Albin, J., dissenting), imposes that very sentence on Acoli.  In doing so, the majority abandons our guiding principles, that "the most despised inmate is

entitled to the protection and enforcement of the law," id. at 234, "and that the law must apply 'equally to all persons, the bad as well as the good.'" Id. at 233 (quoting Trantino v. N.J. State Parole Bd. (Trantino VI), 166 N.J. 113, 197-98 (2001)). Also, by affirming the Parole Board's action, the majority contravenes the public policy behind the Parole Act of 1979, N.J.S.A. 30:4-123.45 to -123.88 (Parole Act), which supports the maintenance of a fair system of parole, by jeopardizing the public's safety. For these reasons, I respectfully dissent.

## I.

At the outset, as we acknowledged in Acoli I, I remain "appalled by Acoli's senseless crimes, which left a member of the State Police, [State Trooper Werner Foerster,] dead and another, [State Trooper James Harper,] injured, as well as one of Acoli's associates dead and the other injured."[1] Acoli I, slip op. at 27. Surely, it was "the most heinous crime . . . which, if committed today, would result in a life sentence without parole eligibility." Acoli II, 224 N.J. at 234 (Albin, J., dissenting). Moreover, both troopers'

---

[1] As we observed in our earlier opinion, "Acoli began a physical struggle with Foerster. According to ballistic evidence, Foerster was shot once with Acoli's weapon, then shot with his own service revolver twice more in the head, killing him." Acoli I, slip op. at 3. We also observed that there were no eyewitnesses to the shooting and noted a statement filed by the county prosecutor in response to Acoli being considered for parole, which speculated that a third party "might have fired Foerster's gun." Id. at 23 n.9.

families' and Trooper Harper's continuing trauma, pain, and suffering cannot be overstated.

It is beyond cavil that Acoli's receipt of the maximum lawful sentence available at the time was, to say the least, appropriate under the circumstances. However, it is equally beyond any dispute that parole determinations must be based upon "what a man is and what he may become rather than simply what he has done." Id. at 222 (majority opinion) (quoting Greenholtz v. Inmates of Neb. Penal & Corr. Complex, 442 U.S. 1, 10 (1979)). That was not the case here.

## II.

An understanding of parole and its importance to the public's safety is central to recognizing why parole determinations must be based upon an inmate's experience and development since he committed his crime, and why the Parole Board's actions here established a disincentive for inmates to pursue proper conduct while incarcerated, thereby threatening the public's safety.

"Parole is a period of supervised release 'by which a prisoner is allowed to serve the final portion of his sentence outside the gates of the institution on certain terms and conditions, in order to prepare for his eventual return to society.'" State v. Black, 153 N.J. 438, 447 (1998) (emphasis omitted) (quoting State v. Oquendo, 262 N.J. Super. 317, 324 (App. Div.), rev'd on

other grounds, 133 N.J. 416 (1993)).  Our current procedure for determining whether an inmate should be paroled was established by the Legislature's 1979 enactment of the Parole Act that changed the entire process.

The purpose for the new legislation was described in accompanying statements issued by the Assembly, Senate, and Governor in 1979.  In those statements, the need for the reform was based upon "uncertainties about parole and perceptions of injustice in the parole process [that had been] key causes" of riots in prisons in New Jersey and elsewhere.  Assembly Judiciary, Law, Public Safety and Defense Committee, Statement to Assembly Bill No. 3093, at 1 (Dec. 3, 1979).  The Legislature envisioned that the reforms would "contribute to the effectiveness of parole as a tool for reducing recidivism, and [would] contribute to the maintenance of institutional order."  Ibid. (emphasis added).

Prior to the 1979 reforms, an inmate was obligated to "prove his fitness to be released in order to be granted parole."  Id. at 2; see also In re Parole Application of Trantino (Trantino II), 89 N.J. 347, 355 (1982).  One of the major reforms was to shift the burden of proof as to an inmate's eligibility for parole from the inmate to the Parole Board.  The legislation required that an inmate "would be paroled on his primary eligibility date unless the State proves 'by a preponderance of the evidence that there is a substantial

likelihood that the inmate will commit a crime if released.'" Ibid.; see also

N.J. State Parole Bd. v. Byrne, 93 N.J. 192, 205 (1983) ("The legislation shifts

the burden to the State to prove that the prisoner is a recidivist and should not

be released.").

The 1979 Parole Act therefore "create[d] a presumption of release on [an

inmate's] parole eligibility date." Kosmin v. N.J. State Parole Bd., 363 N.J.

Super. 28, 41-43 (App. Div. 2003). Moreover, it "create[d] a legitimate

expectation of release . . . absent findings that justification for deferral exists,"

and gave rise to "a federally-protected liberty interest." Trantino VI, 166 N.J.

at 197 (quoting Byrne, 93 N.J. at 207).

The reasons for why this change was important to the overhaul of the

process was summarized as follows:

> First, it is felt that this shift better complements the generally longer sentence of the code and that the power to decide how long a convict should be imprisoned belongs to the sentencing court rather than the parole board. Secondly, it is argued that the shift better reflects the practicalities of the parole process. Since the key issue in determining fitness for parole is the question of recidivism and since it is impossible for a person to prove he will not do something, the present practice is for the authorities to present evidence showing a likelihood of future criminal activity in order for there to be a denial of parole. Thus, it is felt that in shifting the burden, Assembly Bill No. 3093 merely confirms statutory law to the practical dynamics of the parole process. The third reason offered for the shift in burden is the hope that it

> will make the parole process more consistent and predictable. The official reports on the Rahway and Attica riots cited uncertainties about parole and perceptions of injustice in the parole process as key causes of the riots.
>
> [Senate Law, Public Safety and Defense Committee, Statement to Assembly Bill No. 3093, at 2-3 (Dec. 10, 1979) (emphasis added).]

As the Legislature recognized, predictability is vital to the parole process. In order to maintain public safety, inmates must understand that their protected interest in being paroled is honored by the grant of parole to deserving prisoners. The anticipation of parole for inmates who have served sentences with little or no incidents or infractions provides positive reinforcement for behavioral change, and is a viable incentive for prisoners to rehabilitate themselves while in prison and avoid engaging in criminal behavior. The possibility of parole encourages prisoners to adhere to prison rules and maintain good behavior in prison.

For that reason, if model prisoners, like Acoli, perceive that parole decisions are not based upon an inmate's development and rehabilitation since he committed his crime, but upon the crime itself, there is no incentive to maintain order, creating a risk of a resurgence in the prison unrest that the 1979 Parole Act sought to address. The possibility of that resurgence is

heightened where, as here, there is insufficient evidence that a candidate for parole is substantially likely to commit a crime if released.

### III.

Under the Parole Act, a Parole Board's decision to grant or deny parole for crimes committed before August 1997 turns on whether there is a "substantial likelihood" that the inmate will commit another crime if released.[2] N.J.S.A. 30:4-123.53(a) (1979); see also N.J.A.C. 10A:71-3.10(a); Acoli II, 224 N.J. at 235-36 (2016) (Albin, J., dissenting); Williams v. N.J. State Parole Bd., 336 N.J. Super. 1, 7 (App. Div. 2000). "The [Parole] Act thus posits the likelihood of future criminal conduct as the determinative test for parole eligibility and effectively establishes a presumption in favor of parole." Trantino II, 89 N.J. at 355-56. Under this test, the burden is on the Parole Board "to prove that the prisoner is a recidivist and should not be released." Byrne, 93 N.J. at 205.

"The [Parole] Board is the administrative agency charged with the responsibility of deciding whether an inmate satisfies the criteria for parole release under the Parole Act of 1979." Trantino VI, 166 N.J. at 173 (quoting

---

[2] The standard for parole for crimes committed after 1997 is different. That standard requires that there be proof "by a preponderance of the evidence that the inmate has failed to cooperate in his or her own rehabilitation or that there is a reasonable expectation that the inmate will violate conditions of parole . . . if released on parole at that time." N.J.S.A. 30:4-123.53.

In re Parole Application of Hawley, 98 N.J. 108, 112 (1984)).  In determining parole eligibility, the Parole Board is to consider the twenty-three non-exclusive factors enumerated in N.J.A.C. 10A:71-3.11(b), including commission of offenses or serious disciplinary infractions while incarcerated; the nature and pattern of previous convictions; facts and circumstances of the offense; participation in institutional programs; statements of institutional staff as to readiness for parole; relationships with institutional staff; changes in attitude; personal strengths and motivations; statements from the inmate, the prosecutor's office, and the victim's family; and the results of objective risk assessment instruments.  However, the Parole Board is not required to consider each and every factor, rather it should consider those applicable to each case.  McGowan v. N.J. State Parole Bd., 347 N.J. Super. 544, 561 (App. Div. 2002).  It should not place undue emphasis on any one factor, especially the crime that the inmate committed.  See Trantino VI, 166 N.J. at 189-90 (stating the Parole Board may not rely on selective portions of the record that support its determination of likely recidivism while overlooking or undervaluing conflicting information).

Here, "the Parole Board's finding that [Acoli] was substantially likely to recidivate was based not on a preponderance of the evidence in the record, but rather on the [Parole] Board's selective and arbitrary reliance on only those

portions of the record that could possibly support the [Parole] Board's conclusion," and which related to his refusal to admit that he shot Foerster. Id. at 189. In reaching its conclusion that there was a substantial likelihood Acoli would commit a crime if released on parole, the Board ignored "substantial evidence in the record, spanning many years of infraction-free incarceration and [a] favorable psychological evaluation[], that demonstrated [Acoli]'s likelihood of success on parole." Ibid.

As recognized by the majority's opinion, the Parole Board's questioning of eighty-two-year-old Acoli and its final decision "heavily relied," ante at __ (slip op. at 21), upon Acoli's commission of the crime and "for the first time," ante at __ (slip op. at 29), his speculation about how his victim died, which differed from what his jury found more than four decades ago.[3] At the 2016 hearing, as he did when we last reviewed this matter, and for decades before that, Acoli continued to maintain that he blacked out and did not know who actually shot Foerster. In response to questioning at the 2016 hearing that called for Acoli to speculate as to who he thought might have shot the Trooper,

---

[3] As we observed in our earlier opinion, "Acoli consistently claimed that he was temporarily unconscious or 'blacked out' when Foerster was shot, having been grazed on his head by a bullet shot by Harper. He had no sign of such an injury when arrested." Acoli I, slip op. at 3 n.2.

Acoli stated it could have been "friendly fire," and he did not mention whether he was conscious.

As the majority discusses at length, that speculation was inconsistent with his previous assertion that he did not know who shot Foerster and contradicts his claim that he passed out before the Trooper was shot. All of the other factors relied upon by the Parole Board in reaching its decision to deny parole were essentially identical to those that the Parole Board panel relied upon when it denied Acoli parole in 2011.[4] The only new substantive material considered by the Parole Board was a report from a psychologist who formulated a much less favorable opinion about Acoli than the report the Board considered in 2011, from Lois D. Goorwitz, Ph.D.[5] The new report,

---

[4] At oral argument, the Parole Board agreed that it primarily relied upon Acoli's refusal to admit he pulled the trigger on the gun that killed Trooper Foerster, and that nothing else had changed about Acoli since we last reviewed the Parole Board's 2010 denial.

[5] On remand from the Supreme Court, the Parole Board did not explain why it failed to rely on Goorwitz's report, but instead considered a new, less favorable report from a different professional.

In his dissent, Justice Albin summarized the factors that we found in 2014, which I conclude remained unchanged in 2016, and Goorwitz's findings. He stated the following:

> The appellate panel made the following observations:
> (1) Acoli has not committed a single disciplinary infraction since 1996, and accumulated only minor

(continued)

10                                                                                    A-5645-16T2

which recommended against parole, also relied upon Acoli's refusal to admit he fired the weapon that killed Trooper Foerster.[6]

---

(continued)

> infractions since 1979; (2) his institutional progress report indicated that he "'has displayed a positive rapport with both staff and inmates'"; (3) Acoli "completed at least 100 different programs for self-improvement as well as vocational training"; (4) Acoli was a prisoner representative for the correctional facility's social resource organization, and as a result of "his positive institutional record, he became a member of the Honors Unit program"; and (5) in 2008, prison staff reported that Acoli had "demonstrated adequate coping skills . . . and ability to establish positive interaction with others," and that he was expected "to be able to transition to the community if paroled."
>
> The appellate panel also referenced the pre-parole mental health evaluation conducted by . . . Goorwitz . . . . Dr. Goorwitz noted that Acoli "'expressed regret and remorse about his involvement in the death of the state trooper'" and "'appeared to be answering honestly.'" Dr. Goorwitz also found Acoli "'to be very cooperative, self[-]reflective, thoughtful, and non[-]defensive in his responses to the questions posed to him.'" (alteration in original). She concluded that "'there were "NO psychological contraindications to granting parole."'"
>
> [Acoli II, 224 N.J. at 238-39.]

[6] Without breaching the confidentiality of the report, it bears mentioning that it did not state that Acoli said anything about "friendly fire" when asked to speculate about who killed Foerster.

After considering the new report and other confidential records, as well as Acoli's testimony, the Parole Board denied his application, relying upon its members' dissatisfaction with Acoli's development over the last forty-six years since he committed his heinous crime. The Parole Board based its decision on his slow manner of speaking, the lack of depth to his answers, and significantly, as the majority recognized, the Parole Board's primary concern that Acoli still refused to admit that he shot Foerster. The Parole Board relied on that refusal to discount Acoli's repeated expressions of remorse for his involvement in the conduct that led to the Trooper's death and his exemplary record as a model prisoner for at least the past twenty years.

The Parole Board's continued reliance on Acoli's refusal to admit to firing the fatal shots was insufficient to support its conclusion that he is substantially likely to commit a crime if released. "[T]he Parole Board cannot insist that [an inmate]'s insight into [his] criminal behavior is impaired by reason of the fact that [he] will not admit that [he] was the actual shooter." Kosmin, 363 N.J. Super. at 42. Such reliance is an abuse of the Parole Board's discretion. See Trantino VI, 166 N.J. at 177-78 (finding that "the Board's

A-5645-16T2

reliance on [petitioner's] inadequate recollection of the details of his crimes to support its denial of parole constituted a clear abuse of discretion").[7]

I recognize the deference we afford to Parole Board determinations and that we will "not lightly reverse a parole-denial decision by the Parole Board." Kosmin, 363 N.J. Super. at 43. Such action in the case of a convicted murderer of a law enforcement officer is, to say the least, "unusual." Acoli II, 224 N.J. at 232. But, we remain tasked with "ensuring that administrative agencies not thwart the law in unpopular cases." Id. at 240 (Albin, J., dissenting) (citing Trantino VI, 166 N.J. at 197). "[C]ourts [cannot] permit agencies of government to create exceptions to the rule of law, applying it for the many but exempting the disfavored, [without] irreparably damag[ing] the foundation of our democracy." Id. at 233 (quoting Trantino VI, 166 N.J. at 198).

Where, as here, the Parole Board denies parole because of an inmate's refusal to accept the facts as found by the jury, its decision cannot stand.

---

[7] Notably, at the 2016 hearing, one of the Parole Board's members expressed his misguided view of the Court's holding in Trantino VI when he asked Acoli "Why would we think that you haven't taken a page out of the Trantino handbook, you know, which is basically, you know, how to -- how to kill a police officer, and then get paroled for it later on in life by -- by saying  I don't remember?"  The same member described the Court's holding again by stating "Well, it's basically a blanket disclaimer of responsibility for anything that happened because . . . I just can't remember it."

13

"[E]ven the most despised inmate is entitled to the protection and enforcement of the law." Id. at 234. For this reason, although Acoli may be one of "the most disfavored member[s] of society," id. at 241, I continue to hew to our earlier conclusion regarding Acoli's entitlement to parole and I would reverse the Parole Board's denial in this case.[8] See Acoli I, slip op. at 27-28. I would do so because our system of justice does not permit anything less.

My view is not altered by the majority's opinion. Its reliance on Acoli's recent speculation about who may have shot Trooper Foerster fails to recognize that Acoli's speculation is an opinion about a possibility and not a statement of fact, and his flawed or even feigned memory loss is not sufficient cause to deny parole. Despite his speculation, Acoli has always maintained that he does not know who actually shot Trooper Foerster.

Acoli has completed the penal portion of his sentence. He is now over eighty years old. He speaks slowly and forgets things. As we previously noted in 2014, his recollection overall was "consistent, but flawed." Acoli I, slip op. at 24. Now, years later, Acoli remains consistent in his claim that he does not remember who in fact shot Foerster. The majority's reliance on his

_____

[8] Notably, the Supreme Court did not pass upon our reasoning in Acoli I as it reversed our determination on procedural grounds, finding that after the Parole Board's panel denied parole, the next step in the administrative process was a full hearing before the entire Parole Board. See Acoli II, 224 N.J. at 232.

A-5645-16T2

flawed speculation as to how he supposes that friendly fire may have caused Trooper Foerster's death is not sufficient to sustain the Parole Board's actions.

In any event, although not admitting to being the actual shooter, Acoli has repeatedly expressed his remorse for his involvement in the crime that led to Trooper Foerster's death, he has disavowed his involvement with the radical group—the Black Liberation Army—and the necessity for violence, and he acknowledged the change in his thinking through counseling, classes, and President Obama's election. Acoli I, slip op. at 24-25.[9] Also, as Acoli is now an octogenarian, there is a substantial decrease in any likelihood that he would commit a crime if released. See State v. Davis, 96 N.J. 611, 618 (1984) ("[A]ge, as a demographic variable, has consistently been found to be strongly related to subsequent criminal activity.").

The majority's comprehensive explanation of the Parole Board's actions does not alter the reality that Acoli, who is one of the longest-serving inmates in New Jersey, if not the longest, and who has been a model prisoner for decades, is being denied parole without any evidence that he is substantially likely to commit a crime if released. Both Acoli and other prisoners who will

---

[9] Progress notes in the record described Acoli's success in prison programs and individual counseling geared toward developing positive changes in his attitudes that were also reflected by his testimony about the need to avoid criminal behavior, his repudiation of violence, and the positive development of his attitude toward the police and authorities in general and on racial issues.

look to the Parole Board's actions here and see no reason to hope that they will be paroled when eligible, are being wrongfully denied the predictability and justice that the Parole Act of 1979 was intended to secure—not only for their benefit, but for the benefit of the public as well.

"Because of the Parole Board's unjustifiable and 'obvious overlooking or undervaluation of crucial evidence,' [I] have no doubt that its determination, based not on a preponderance of all evidence, but on evidence arbitrarily selected to support a desired result, is manifestly mistaken and [should] be set aside." Trantino VI, 166 N.J. at 192 (citation omitted).

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION