**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1521-23

J.B.,[1]

    Appellant,

v.

NEW JERSEY STATE
PAROLE BOARD,

    Respondent.

_____

Argued March 11, 2025 – Decided March 26, 2025

Before Judges Gilson, Firko, and Bishop-Thompson.

On appeal from the New Jersey State Parole Board.

Lucas B. Slevin, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Morgan A. Birck, Assistant Deputy Public Defender, and Lucas B. Slevin, of counsel and on the briefs).

Hilary Cohen, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney

---

[1] We use initials to protect appellant's privacy interests because the appeal requires that we discuss his mental health records.

General, attorney; Janet Greenberg Cohen, Assistant Attorney General, of counsel; Hilary Cohen, on the brief).

PER CURIAM

J.B., currently an inmate at East Jersey State Prison, appeals from a December 13, 2023 final agency decision by the New Jersey State Parole Board (Board) denying him parole and imposing a thirty-six-month future eligibility term (FET). We affirm.

I.

The factual and procedural history are set forth in this court's unpublished opinion entered on December 19, 2024, in which we reversed and remanded J.B.'s March 31, 2023 judgment, which re-sentenced him to a term of life imprisonment with twenty-nine years of parole ineligibility for felony murder and purposeful and knowing murder he pled guilty to as a minor in 1995. State v. [J.B.], No. A-2359-22 (App. Div. Dec. 19, 2024) (slip op. at 2-3). In our recent opinion, we recounted the pertinent facts and procedural history associated with J.B.'s crimes from his prior appeal as follows:

> [J.B.] [and two co-defendants, one of whom was L.B.,] murdered an elderly couple during a home invasion burglary on March 2, 1994. Before breaking into the isolated home through a basement window, [L.B.] cut wires he believed activated a burglar alarm system, and almost immediately shot the wife four

times, execution-style. The group dragged the victim's body down the stairs and left her in a corner of the basement. The victim's husband returned home some forty-five minutes later. [J.B.] shot twice, striking the husband's cheek with the second bullet. The husband fled the house and ran down the driveway, attempting to escape. The burglars gave chase. When they caught him, one of them smashed the husband's head with the butt of the gun, knocking him down to the ground, before the group kicked and beat him. The trio dragged the husband back into the house where they stabbed and pummeled him to death. The medical examiner found the husband suffered twenty-seven separate injuries, including thirteen cut wounds, four tear wounds, four fractured ribs, a bullet wound, and numerous defensive wounds. [J.B. was] prosecuted as [an] adult . . . .

[Id. (quoting State v. [J.B.], Nos. A-2961-18, A-5023-18 (App. Div. Feb. 4, 2022) (slip op. at 3)).][2]

Regarding the present appeal, J.B. had been resentenced pursuant to State v. Comer, 249 N.J. 359 (2022), to a term of life imprisonment with a twenty-nine-year parole bar. Based on that resentencing, J.B. became immediately parole eligible.

During his incarceration, in June 1995, J.B. was adjudicated guilty for one infraction, possession/introduction of a weapon, *202,[3] which he claimed was

_____

[2] J.B.'s resentencing hearing is pending.

[3] N.J.A.C. 10A:4-4.1(a)(1)(xvii). See Berta v. N.J. State Parole Bd., 473 N.J. Super. 284, 293 n.5 (App. Div. 2022) (stating "asterisk" infractions are

an instrument for tattooing. In anticipation of his parole eligibility, in June 2023, Jan Segal, Ph.D., conducted a mental health parole evaluation of J.B. As part of his evaluation, Dr. Segal conducted a Level of Service Inventory-Revised (LSI-R) assessment, an actuarial tool used to assess offender risk and needs, and the Millon Clinical Multiaxial Inventory-III (MCMI-III), an assessment tool used to evaluate personality traits and psychopathology. Based on an LSI-R score of twenty-one, Dr. Segal opined that J.B. presented "a moderate risk for recidivism with a 17.1% chance of reconviction within two years of release."

Dr. Segal described J.B.'s risk for reoffending as "moderate" and his risk for future violence to be "low to moderate" but noted the "extent of prior violent crime" in his report. Dr. Segal found J.B.'s MCMI-III personality inventory score yielded a "valid profile" and "[n]o adjustments were required due to any unusual response sets." In addition, Dr. Segal noted the MCMI-III test results indicated J.B. had "[n]o acute psychiatric disturbance" currently. Dr. Segal opined that J.B. has "improved anger control and decision-making," and his prior poor "decision-making, emotional immaturity, and aligning with negative

"prohibited acts considered to be the most serious violations, resulting in the most severe sanctions.")

peers" has "likely tempered with some degree of personal maturity." Dr. Segal noted J.B. completed his GED and has "stable and productive work in NJDOC."[4]

Dr. Segal concluded J.B. "minimizes problems" related to mental health treatment to address his "remnants of underlying exposure to trauma as a child," J.B. "does not appear motivated to address such at this time," and he "minimizes problems related to these issues." Dr. Segal stated J.B. "does not meet the criteria for civil psychiatric commitment" and his "readiness for parole" was "generally [fair]."

On August 7, 2023, a two-member panel of the Board held a parole eligibility hearing. The Board panel denied J.B. parole and established a thirty-six-month FET based on : (1) the facts and circumstances of his murder offenses; (2) J.B.'s incarceration for multiple offenses; (3) J.B.'s institutional serious infraction that led to his confinement in detention; (4) J.B.'s results from an objective risk assessment indicating moderate risk of recidivism; and (5) J.B.'s insufficient resolution, specifically lack of insight into his criminal behavior and minimization of his conduct. The decision was memorialized in a standard checklist sheet.

---

[4] NJDOC stands for the New Jersey Department of Corrections.

The Board panel checked five mitigating factors: no prior offense record; participation in programs specific to behavior; participation in institutional programs; institutional reports reflect favorable institutional adjustment; and J.B.'s attempts to enroll and participate in programs. The panel checked a box that it had determined "a substantial likelihood exists" that J.B. would commit a new crime if released on parole.

The Board panel noted J.B.'s 1995 infraction and reasoned that "[d]espite programming, [J.B.] has not developed an understanding as to what led to his use of unprovoked total rage [and] violence against his victims. Shows lack of understanding of what triggered him to utilize his criminal thinking [and] behavior patterns." The Board panel noted J.B.'s "remorse by his interview is lacking for the weight [and] extent of the effects of his violent conduct."

J.B. administratively appealed from the Board panel's decision. On December 6, 2023, the Board panel amended its notice of decision to state the panel considered the fact that J.B. has achieved and maintained "minimum custody" status as a mitigating factor, but did not change its final recommendation.

On December 13, 2023, the full Board issued its final agency decision, affirming the denial of parole and the imposition of a thirty-six-month FET. The

6

full Board considered each of J.B.'s contentions, analyzed them, and identified the same reasons for denying parole as the two-member panel.

On appeal, J.B. argues that the Board's decision is arbitrary and capricious for six reasons:

> (a) the Board did not correctly apply the objective standard of the 1979 Parole Act;
>
> (b) the Board failed to adequately weigh J.B.'s exceptional institutional record compared with the weight it placed on the facts and circumstances of the offenses, and other events that took place decades ago;
>
> (c) the Board failed to properly weigh the psychological report;
>
> (d) the Board failed to consider or adequately weigh J.B.'s age at the time of the offense and subsequent maturity;
>
> (e) the Board's use of "lack of insight" to deny J.B. parole was not supported in the record;
>
> (f) a panel member blatantly failed to comply with the Board's Professional Code of Conduct during the two-member Board panel hearing.

## II.

We review a Parole Board's determination deferentially "in light of its expertise in the specialized area of parole supervision." J.I. v. N.J. State Parole Bd., 228 N.J. 204, 230 (2017) (citing McGowan v. N.J. State Parole Bd., 347

N.J. Super. 544, 563 (App. Div. 2002)). We will not reverse the Board's decision "unless found to be arbitrary . . . or an abuse of discretion." Pazden v. N.J. State Parole Bd., 374 N.J. Super. 356, 366 (App. Div. 2005) (omission in original) (quoting Trantino v. N.J. State Parole Bd. (Trantino IV), 154 N.J. 19, 25 (1998)). Unless the Board "went so far wide of the mark that a mistake must have been made," its decision should not be disturbed. N.J. State Parole Bd. v. Cestari, 224 N.J. Super. 534, 547 (App. Div. 1988).

In reviewing a final decision of the Board, we are obligated to "determine whether [the Board's] factual finding could reasonably have been reached on sufficient credible evidence in the whole record." Trantino v. N.J. State Parole Bd. (Trantino VI), 166 N.J. 113, 172 (2001) (quoting Trantino IV, 154 N.J. at 24). Specifically, we must consider: (1) whether the Board's action is consistent with the applicable law; (2) whether there is substantial credible evidence in the record as a whole to support its findings; and (3) whether in applying the law to the facts, the Board erroneously reached a conclusion that could not have been reasonably reached based on the relevant facts. Ibid.

"The discretionary power exercised by the Parole Board, however, is not unlimited or absolute." Acoli v. N.J. State Parole Bd., 250 N.J. 431, 455 (2022). "[W]hen a parole decision is so far wide of the mark or so manifestly mistaken

under the governing statutory standard, intervention is required in the interests of justice." Ibid. (citing Trantino VI, 166 N.J. at 192). A Board decision will not be sustained if it violates legislative policy, is not supported by substantial evidence in the record, or "could not reasonably have been made on a showing of the relevant factors." Ibid. (quoting Trantino IV, 154 N.J. at 24).

A.

The Parole Act of 1979, which governs J.B.'s parole, states that a prisoner "shall be released on parole at the time of parole eligibility, unless [it is shown] by a preponderance of the evidence that there is a substantial likelihood that the inmate will commit a crime [under the law of this State] if released on parole at such time." Ibid. (quoting Trantino VI, 166 N.J. at 126) (alterations and omissions in original) (quoting N.J.S.A. 30:4-123.53 (1979)). "Assessing the risk that a parole-eligible candidate will reoffend requires a finding that is more than a mere probability and considerably less than a certainty." Id. at 456. "Only when the risk of the offending rises to 'a substantial likelihood' may a parole - eligible inmate be denied parole." Ibid. (citing Cestari, 224 N.J. Super. at 550).

Under the 1979 Parole Act, the Board must assess numerous factors in determining whether the person is ready for parole. Ibid. N.J.A.C. 10A:71-3.11(a) states that the "grant or denial of parole must be based on the aggregate

of all pertinent factors." Id. at 457. "That regulation sets forth a list of twenty-four factors that the . . . Board 'shall consider,' in addition to other factors [the Board] may deem relevant." Ibid. (citing N.J.A.C. 10A:71-3.11(b)).

Our Supreme Court in Acoli explained:

> Some of those factors include: facts and circumstances related to the underlying crime; offenses and disciplinary infractions committed while incarcerated; participation in institutional programs and academic or vocational education programs; documentation reflecting personal goals, personal strengths, or motivation for law-abiding behavior; mental and emotional health; parole plans; availability of community resources or support services; statements by the inmate reflecting on the likelihood that he [or she] will commit another crime; the failure to rehabilitate; history of employment and education; and statement or testimony of any victim.
>
> [Ibid.]

J.B. contends the Board improperly shifted the burden to him to show he was "sufficiently rehabilitated," which is the standard under the 1948 Parole Act, and failed to prove its own burden that he was substantially likely to reoffend. In particular, J.B. points out that the Board panel asked him whether he believed that he has spent enough time in prison for his offense and questioned his fitness for parole. During the Board panel hearing, one Board member asked J.B. the following:

[MEMBER]: [J.B.], do you feel as though you've served enough time? Do you really believe in your heart that you served enough time for [. . .] these two brutal murders that you did . . .

[J.B.]: There's absolutely [. . .]

[MEMBER]: [] and were part of?

[J.B.]: Absolutely not. There's no way I could ever serve enough time for what I did.

[MEMBER]: But yet you think [. . .] you're a good candidate for parole?

[J.B.]: I know I'm not coming back to prison, sir.

. . .

[MEMBER]: I don't know if I asked you [. . .] but why do you think you would be a good candidate for parole?

[J.B.]: Because I am a different person than I was back then. And I believe I can give to [. . .] whatever community I'm living in I can be supportive in that community and help out and do things for other people.

J.B. argues that the Board shifted the burden onto him based on the member's questioning regarding J.B.'s rehabilitation. We disagree. The questions posed by the Board panel went directly to J.B.'s insight into his criminal behavior and provided J.B. with the opportunity to address the N.J.A.C. 10A:71-3.11(b) factors, including his attitude toward himself and others, his mental and emotional health, his personal goals, his family support and parole

11

plans, and his growth and maturation while incarcerated. Based on J.B.'s answers to the Board panel members' questions, the requisite analysis was conducted as required by the 1979 Parole Act. Thus, we discern no abuse of discretion.

B.

J.B. next contends the Board failed to adequately weigh his "exceptional" institutional record compared with the weight it placed on the facts and circumstances of the offenses. According to J.B., he has taken and attempted to take every available program, furthered his education, maintained a steady work history, and has been "praised" by prison staff for his work and "exceptional institutional record."[5] Relying on Berta, J.B. asserts the Board instead focused on events that occurred when he was a juvenile and not the "last [twenty-nine] years of infraction-free living." 473 N.J. Super. at 290. J.B. argues the Board "lost sight of its mission," which was "to determine the man [J.B.] had become," as mandated in Acoli, 250 N.J at 463.

---

[5] J.B. has completed the following programs: SEALL Employment Readiness, Cage Your Rage (Anger Management), Family Reunification and Transition (twice), STARS Reentry Preparation, T4C Cognitive Behavioral Change, the 12 Steps program, and Living in Balance.

The weight to be assigned to any one factor will depend on the unique history, background, and characteristics of the individual and the institutional record developed during years of incarceration. Id. at 457. Some factors may have high value and others lower value. For example, although the "[f]acts and circumstances of the offense" is one factor, N.J.A.C. 10A:71-3.11(b)(5), "the gravity of the crime" cannot serve as "an independent reason for continuing punishment and denying parole under the 1979 Act. That is because the punitive aspects of the sentence have been satisfied by the time an inmate is eligible for parole." Ibid.

The failure of an inmate "to cooperate in his or her own rehabilitation" is another factor. N.J.A.C. 10A:71-3.11(b)(9). An inmate's progress or lack of progress toward rehabilitation is relevant only to the extent it bears on whether there is a substantial likelihood that he will reoffend if released. In assessing the weight to be given to this factor, an inmate's "prison record plainly is material" —including any institutional infractions, the appraisals of work supervisors, participation in individual and group psychotherapy, and the completion of educational and rehabilitative programs. Acoli, 250 N.J. at 457-58.

The August 7, 2023 notice of decision cites the *202 infraction for possession of a weapon as an aggravating factor. However, it is clear that the

A-1521-23

notice of decision and the final agency decision considered the fact the offense occurred in 1995 and that it was J.B.'s last institutional offense. There is nothing in the record to suggest the Board improperly gave too much weight to the 1995 infraction.

The Board also weighed J.B.'s participation in programs he successfully completed, his positive institutional adjustment, and maturation. The Board believed that notwithstanding J.B.'s program participation, he still failed to comprehend what led to his "use of unprovoked, fatal rage and violence against his victims." We are satisfied the Board applied the appropriate Acoli standards and did not "focus their attention squarely on the likelihood of recidivism." McGowan, 347 N.J. Super. at 565.

## C.

J.B. next contends the Board failed to properly weigh Dr. Segal's psychological report. J.B. argues the report was "generally positive," tracks his "maturation of a juvenile into adulthood," and notes J.B. "accepts responsibility for his actions." J.B. cites to Dr. Segal's report stating J.B. would be a "low to moderate risk for future violence," and has a "reticent, fearful[,] and impressionable quality," which "appears to a much less degree at this time." J.B. maintains Dr. Segal's conclusions "undermine" the Board's findings that J.B.

14

minimizes his conduct and that his "lack of insight" has anything to do with recidivism.

J.B. claims he is the "poster child for Comer" whose brain "has fully developed" making him unlikely to engage in "problematic behavior" in the future. J.B. also argues the Board did not consider the psychological report prepared at the time of his sentencing, which described his susceptibility to peer pressure, being labeled a "follower" by two separate mental health professionals, and his acts of "impetuosity and impulsivity."

The Board's rationale for denying parole relied on the entirety of Dr. Segal's report, which details that: (1) defendant minimized the role his childhood trauma played in his anger issues and was not ready to deal with that trauma; (2) defendant's personality profile is highly susceptible to depression, dismay, and erratic moodiness and has cognitive deficits; and (3) defendant has a moderate risk to reoffend based on his history, interview findings, and LSI-R score.

Dr. Segal's report did not unequivocally state that J.B. would not recidivate. Rather, Dr. Segal opined that J.B. was a "moderate risk for reoffending." The Board rightfully considered Dr. Segal's report, including his opinions that J.B. is highly susceptible to "depression, dismay, and erratic

15

moodiness," and J.B. has cognitive deficits. The Board's decision was based on substantial, credible evidence in the record. Trantino IV, 154 N.J. at 23-24. Hence, we decline to disturb it.

D.

J.B. next argues the Board failed to consider or adequately weigh his age at the time of the offenses and his subsequent maturity during incarceration as required by N.J.A.C. 10A:71-3.11(b)(24), which was amended in 2021. The Board noted J.B. asserted that he was "at the height of the age-crime curve when [he] committed his offenses . . . that [his] brain had not fully developed and made [him] more likely to engage in risky, impulsive behavior . . . [and] had twenty-nine . . . years to grow and mature." Moreover, the Board stated that J.B. "claim[ed] [he] was incarcerated for an offense . . . [he] committed at the age of seventeen . . . , . . .[and] the 'irresponsible conduct [of juveniles] is not morally reprehensible as that of an adult . . . . '"

Contrary to J.B.'s assertion, the Board did consider his youth at the time of the offenses and his maturation as mitigating factors required by N.J.A.C. 10A:71-3.11(b). Specifically, the Board found that:

> Recognizing that you were of a youthful age at the time of the commission of the offenses, the Board panel needed to assess whether you have achieved a level of maturity that would have a positive impact on your

suitability for parole release. As noted by the Board panel in the [n]otice of [d]ecision, you have not developed an understanding to what led to your use of unprovoked, fatal rage[,] and violence against your victims. The Board finds that after nearly thirty . . . years of incarceration you have not achieved an adequate understanding of your thought process and the impact of same on your criminal conduct[.] The Board, therefore, finds your assertions to be without merit.

J.B. also asserts that the Board panel did not give him an opportunity to explain his years of programming and maturing taught him anger management and to resolve conflict through communication. In its final agency decision, the Board highlighted:

> Upon review of the electronic recording of the hearing, the Board finds that the Board panel inquired about why [J.B.] had so much rage, and [J.B.] responded by stating "at the time [he] did not know how to express [his] anger and at that time, [he] had no respect for people and [he] just did not care." The Board also finds, that the Board inquired as to how [J.B. was] different from the seventeen . . . year old that committed these crimes, and [he] responded "today, I think about my actions, I have replaced my victims with my parents and how that would make me feel." Therefore, the Board finds that [J.B. was] given the opportunity to express his growth and maturity over the years . . . .

The current record supports the Board's determination, and its decision was not arbitrary, capricious, or unreasonable.

## E.

Finally, J.B. contends a Board panel member failed to comply with the Board's Professional Code of Conduct during the two-member Board panel hearing rendering the Board's decision arbitrary, capricious, and unreasonable. According to J.B., the member constantly interrupted him and was "hostile" to the point where J.B. broke down in tears. J.B. contends the member was "argumentative, sarcastic, and adversarial" throughout the entire hearing, thus violating the Professional Code of Conduct.

Under N.J.A.C. 10A:71-3.13(l), the "Board shall adopt a professional code of conduct and parole hearings shall be conducted in accordance with the professional code of conduct." Under N.J.A.C. 10A:71-4.1(a)(6), "[a]ny denial of parole by the . . . adult Board panel shall be appealable to the Board provided . . . [a] Board member participating in the deliberations or disposition of the case has failed to comply with the Board's professional code of conduct." The Board's Code of Professional Conduct, under statutory authority, states that "[a]ll SPB employees shall present themselves in a respectful, professional and courteous manner to any individual(s) with whom they deal with in an official capacity including, but not limited to, offenders[.]" The Code also states that "[h]earings shall be conducted in a non[-]adversarial manner." Ibid.

J.B. reprises the same arguments on appeal on this issue that he raised before the full Board. The Board concluded there was no evidence to support J.B.'s allegation that the member's conduct was unprofessional and in violation of the Board's Professional Code of Conduct. In its final agency decision, the Board specifically addressed this issue:

> Pursuant to N.J.A.C. 10A:71-3.11(b)(5), (6), (17), [J.B. was] asked appropriate questions about the facts and circumstances of [his] offenses; the aggravating and mitigating factors surrounding the offenses; and statements made by [J.B.] reflecting on the likelihood that [J.B.] will commit another crime, respectively, all in a professional manner and the Board panel afforded [J.B.] a significant opportunity to speak on several points. . . .
>
> Upon review of the record, the Board finds that [J.B.'s] appeals and motions for post-conviction relief are a matter of record and were on file and available for review by the Board panel. The Board finds that the Board panel appropriately sought clarification regarding your motions for post-convictions relief, the outcomes and [J.B.'s] re-sentencing. . . .

The Board reviewed an electronic recording of the hearing before the two-member Board panel and determined there was no evidence support J.B.'s allegation of unprofessional conduct by the member. The Board noted in its final agency decision that J.B. claimed the member inquired about "how the female victim was rolled up in a rug," and J.B. stated he found that out "after

the fact," and he "didn't believe she was rolled in the rug, but the rug was over her." The member responded to J.B., "you are able to say whatever you want, I am just telling you what I am reading."

The Board also noted that J.B. claimed the member was "argumentative" regarding how many times the male victim was stabbed, J.B. was "acting" like he did not stab the male victim "multiple times," and the member prevented J.B. from discussing co-defendants' role during the commission of the offenses, thus minimizing his role. J.B. also maintained the member told him the Board panel members were "struggling with the things presented in [c]ourt" and what was being said at the Board panel hearing.

The Board found there was no evidence to support J.B.'s allegations of unprofessional conduct. Based upon the Board's review of the hearing, it determined that J.B. was asked "appropriate questions" regarding the facts and circumstances of the offenses "in a professional manner," and the Board panel afforded J.B. "a significant opportunity to speak on several points."

The record contains evidence to support the Board's findings. The Board considered the appropriate factors in rendering its parole decision and applied the correct legal standards. We are unpersuaded the Board's decision was arbitrary, capricious, or unreasonable. Further, we cannot conclude the Board's

20

final decision "went so far wide of the mark that a mistake must have been made," hence we decline to disturb it. Cestari, 224 N.J. Super. at 547.

All this said, we point out that at J.B.'s next parole hearing, the Board will need to consider the matter with a fresh review. Consequently, at the next hearing, the Board should give J.B. a fair opportunity to respond fully to any questions posed by Board members and "to rebut any evidence and . . . to present evidence on his . . . own behalf," consistent with N.J.A.C. 10A:71-3.13(e). The Board will also need to base its decision on the facts and governing law, which includes: (1) a presumption in favor of parole; and (2) the burden on the State to prove, by a preponderance of the evidence, that there is a substantial likelihood J.B. will commit a crime if released on parole. The Board will then need to issue a complete and meaningful explanation of the reasons for whatever action it takes.

Any remaining arguments advanced by J.B. lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-1521-23